(No. 65070.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RONALD BARROW, Appellant.

*Opinion filed October 25, 1989.—Rehearing
denied January 29, 1990.*

RYAN and CALVO, JJ., took no part.

Charles M. Schiedel, Deputy Defender, of Springfield, and Steven Clark, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen, Michele Lavin and Kenneth A. Fedinets, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

Following a jury trial in the circuit court of La Salle County, the defendant, Ronald Barrow, was found guilty of the murder of Joseph O'Berto (Ill. Rev. Stat. 1983,

ch. 38, par. 9—1), armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2(a)), residential burglary (Ill. Rev. Stat. 1983, ch. 38, par. 19—3), and burglary (Ill. Rev. Stat. 1983, ch. 38, par. 19—1). A hearing was held on the State's motion to determine if the death penalty could and should be imposed. The jury found that there existed one of the aggravating factors set out in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)) and that there were no mitigating factors sufficient to preclude a sentence of death. The trial court sentenced the defendant to death and to a consecutive 30-year prison term on the armed robbery conviction and a 15-year term on the residential burglary conviction. No sentence was entered on the burglary conviction. The defendant's sentence of death was stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

Evidence at trial showed that on February 19, 1984, the body of the victim, Joseph O'Berto, was discovered in the basement of his residence, located in Cedar Point, Illinois. He had been shot in the head, which an autopsy showed to be the cause of death. In a pool of blood beside the body, investigating officers found a spent projectile. Robert Hunton, a forensic scientist with the Illinois Department of Law Enforcement, testified that he examined the projectile and determined that it could have been fired from a gun of any one of four calibers, including a 9 millimeter. Hayden Baldwin, a crime scene technician with the La Salle County police department, testified that several of the stairs leading to the victim's basement had been "torn up" and in the basement he observed an empty safe and three slot machines. Baldwin also stated that he examined the front and rear doors of the residence and found no signs of forced entry.

Darlene Brown, the victim's daughter, testified that on the previous evening she was with her father at his residence from approximately 7 p.m. to 9 p.m. When she returned home, at close to 9 p.m., Brown telephoned her father to inform him that she had arrived safely. The following morning, Brown and her husband Howard were beckoned to the victim's residence by her father-in-law, Floyd Brown, who was there and had been trying, without success, to reach O'Berto. They found the front door to the residence unlocked, several rooms in the house in disarray and the body of the victim lying in the basement in a pool of blood. Brown determined that a number of her father's possessions were missing, including his wallet, which she said typically contained about $500 in denominations of $100; a bankbook with $20,000 on deposit; and a gold money clip.

Leroy Blum, the victim's next-door neighbor, testified that on the evening of February 18, 1984, at approximately 9 p.m., he observed the outside light of the victim's residence go off and then go on again around 10:30 p.m. At close to 1:15 a.m., Blum noticed that the light was still on. At 3 a.m., he awoke and saw that the light had gone off.

Harry Hockings, an Illinois State trooper, testified that on March 15, 1984, Judy Herron informed him that her boyfriend, Harold "Smokey" Wrona, who was incarcerated in a Maryland State prison, had information concerning the victim's death and that he wished to meet with Hockings. Thereafter, Hockings and La Salle County Sheriff Pete Wahl met with Wrona in the prison. Hockings testified that based on information Wrona provided them, they made arrangements with Maryland law enforcement officials to have Wrona released from prison so that he could meet with the defendant and provide the opportunity for him to make incriminating statements concerning the victim's death that could be

recorded with eavesdropping equipment. On April 6, 1984, Wrona and the defendant met in a hotel room in Maryland which was set up with hidden audio and video equipment operated by Maryland law enforcement officials. After the defendant made a number of incriminating statements to Wrona, he was arrested and charged with the offenses stated above.

At trial, Wrona testified that he met the defendant in July of 1983, while they were incarcerated in the same cellblock at a Maryland prison. According to Wrona, he told the defendant that in 1966, two of his friends, Joe Doll and George Lakita, had committed a burglary in Cedar Point and stole $64,000 that they had found under one of the basement stairs. Wrona stated that Doll and Lakita told him that they also found three "barrels of change" in the basement but took only the cash. Wrona also told the defendant that Doll and Lakita had later discovered that an additional $175,000 was hidden in one of the lower basement stairs where they had not searched.

Wrona further testified that on February 2, 1984, after the defendant was released from prison on bond pending an appeal of a Maryland conviction for armed robbery, he visited Wrona in prison. At that time he told Wrona that he was going to Davenport, Iowa, because he had a "score there" and wanted to visit Wrona's son on the way. The defendant also inquired about the robbery of the man in Cedar Point that Wrona had earlier told him about. He sought directions to Cedar Point and asked Wrona whether he knew what the house looked like that had been burglarized.

On February 24, 1984, the defendant again visited Wrona in prison and stated that he had made "a pretty good score" in Cedar Point. The defendant said he and his brother Bruce had watched the victim's home for about a week. Late one night, he knocked on the front

door and told O'Berto that he was having trouble with his car and asked to use the telephone. The defendant stated that he then stuck his foot in the door, pushed the victim back into the house with the gun and handcuffed him.

The defendant said he found a wallet in the victim's pocket which contained five $100 bills and that he searched the house and found a bankbook showing $18,000 on deposit. In the basement, he found an empty safe and three slot machines covered with plastic. The defendant also stated that he and his brother "tore a couple stairs up" but did not find anything. In addition, the defendant said he asked the victim where the money was but the man could not hear so he "whipped him." While pointing a finger to his head, the defendant told Wrona that he "had to take him [the victim] out of it." Wrona testified that the defendant said that he and his brother wore gloves the entire time they were in the house and that he disposed of the gun in a river in Indiana just prior to being stopped by an Indiana State trooper for speeding.

The defendant's conversation with Wrona, which was recorded by eavesdropping equipment while they were in a Maryland hotel room, was played for the jury and a transcript of the recording was received in evidence. The transcript shows that the defendant told Wrona that "everything went just like *** we had planned it." The defendant said he watched the victim's home for a week and that late one evening, after midnight, he forced his way in the victim's house. The defendant stated that although he hit the victim "all over," he would not tell him anything except "where he kept change." The defendant said he searched everywhere and found only a safe in the basement and that was empty. He said also that he "pulled up" the first two stairs leading to the basement but did not find any money. Wrona asked the defendant

what kind of gun he used and the defendant replied that it was a "hot, nine mil[limeter]" which he had obtained in Delaware. The defendant added that he had tossed the gun off a bridge on his way back from Cedar Point.

The State also presented evidence showing that the defendant was in the vicinity of Cedar Point on or about February 18, 1984. Judy Herron testified that in February of 1984, the defendant and his brother Bruce Barrow visited her home in Seatonville, Illinois, which is approximately 20 miles from Cedar Point. She testified that the defendant was driving a white car and told her that he was staying at a Holiday Inn motel in Peru, Illinois, registered under the name Lee Deibert. Several days later, Herron said, the defendant and his brother returned. At that time, according to Herron, the defendant stated that the previous evening Bruce had been stopped by a La Salle County police officer for a traffic offense and that he had to call the police station in an effort to obtain Bruce's release. The defendant added that they had been fortunate because the officers had not discovered a gun that was in the car at the time.

Patricia Hurley, an employee of Budget Rent-A-Car in Newark, Delaware, testified that on February 11, 1984, the defendant rented a white Ford Thunderbird bearing license plate number 744741. A clerk of the Holiday Inn motel in Peru testified that on February 13, 1984, the defendant checked into room 123 with a second man and checked out on February 19.

Kathleen Noll, a La Salle County police officer, testified that on February 16, 1984, at approximately 4:45 a.m., she observed Bruce Barrow driving a white Ford Thunderbird with Delaware license plate number 744741. She said the car was heading the wrong way down a one-way street in downtown La Salle. Noll stopped the car and asked Barrow for a driver's license. Barrow responded that his name was William Payne and that he

had a Delaware driver's license, but did not have it in his possession. Noll then transported Barrow to the police station, where he telephoned the Holiday Inn in Peru and, according to Noll, asked for room 123. Tom Sickley, also a La Salle County police officer, testified that while he was on duty that same night at the La Salle County police station, Bruce Barrow asked him to talk to an individual on the telephone who identified himself as Ronald Barrow. He stated that a short time later an individual who identified himself as Ronald Barrow called the station and asked to speak to William Payne. La Salle County police officer Jack Moriarity testified that he too was on duty at the station that night and received a call from a man calling himself Ronald Barrow who asked to speak with William Payne. A tape recording of all three of the telephone calls was played for the jury.

Walter Hamlin testified that on February 18, 1984, at approximately 10 p.m., he saw Bruce Barrow enter his parent's restaurant located in Cedar Point and purchase cigarettes and candy. Curtis Barmes, an Illinois State trooper, testified that on February 18, 1984, at approximately 1:55 a.m., he observed a white Ford Thunderbird with Delaware license plates number 744741 heading north on Route 51 at a point south of the Illinois River bridge to near Cedar Point. Barmes stated that he observed two white males in the car. Barmes also testified that the only way the car could have reached Route 51 at that point near the Illinois River bridge would have been by turning off a road which led from Cedar Point.

Dave Doll, an Indiana State trooper, testified that on February 19, 1984, at approximately 5:07 a.m. Eastern Standard Time, he observed the defendant driving a white Ford Thunderbird heading east on the Indiana Toll Road. Doll stated that from the Michigan City toll plaza he followed the car for 20 to 30 miles before stopping it

and issuing the defendant a traffic citation for speeding. Doll stated that another man was in the car asleep in the passenger seat. Evidence showed that the distance from the Illinois River bridge outside Cedar Point to the location where Doll stopped the defendant and issued a traffic citation was approximately 160 miles.

The prosecution also presented evidence to link a pair of the defendant's shoes, found in a search of his home in Maryland, to the impression of a shoe recovered from a piece of plywood found in the victim's basement. Robert Hunton, a forensic scientist with the Illinois Department of Law Enforcement, stated that the shoes found in the defendant's apartment "could have made the footwear impressions" considering that the size and the pattern of the sole of the shoes matched those exhibited on the impression. On the heel of the left shoe was found a small bloodstain which contained human blood type O. Both the defendant and the victim were blood type O as well as 45% of the white, male population of the United States.

Upon the jury's finding the defendant guilty and the entering of a judgment of convictions, the State asked for the death penalty. After the first stage of the sentencing hearing, the jury found that the defendant was subject to the death penalty, being 18 years of age or older at the time of the murder and having "actually killed" the victim in the course of a felony, to wit, armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)).

At the second stage of the sentencing hearing, the State presented evidence that in 1983 the defendant was convicted in the State of Maryland for armed robbery and use of a handgun in the commission of a felony and was sentenced to 12 years in prison. Mike Evert testified that prior to the defendant's initial appearance in court on the charges, the defendant asked him to testify that he was with Evert at the time of the robbery. Evert

stated that he had not been with the defendant at that time and refused the request. In 1976, the defendant was convicted of larceny and was sentenced to a term of probation.

The State also presented the testimony of Fran Poore who had worked with the defendant at a 7-Eleven convenience store in Delaware in 1982. Poore stated that on several occasions she observed the defendant with a handgun while he was working at the store and, on one occasion, she observed the defendant put five or six packets of "white powder" on a scale located at the front of the store. John Puican, the defendant's supervisor at the store, testified that the defendant's employment was terminated on December 13, 1982, when a .32-caliber handgun was discovered in his possession at the store.

Frederick Hill testified that on May 11, 1976, the defendant drove by his residence while Hill was playing in the front yard with his son and fired a pellet gun at them. Hill chased the defendant, and when Hill confronted him, the defendant said he was "going to do something" to Hill. The defendant was 16 years old at the time.

In mitigation, the defendant offered the testimony of his brother, mother and a friend, who testified to his being a warm and caring person. They also testified that the defendant often helped the sick and the elderly in his neighborhood and that he once donated blood.

At the conclusion of the hearing, the jury found that there were no mitigating factors sufficient to preclude the imposition of the death penalty and the court sentenced the defendant to death. The cause comes before this court for direct review as our constitution (Ill. Const. 1970, art. VI, §4(b)) and Supreme Court Rule 603 (107 Ill. 2d R. 603) provide.

The defendant argues that his convictions should be reversed and a new trial ordered on several grounds. First, he contends that he was denied the effective assistance of counsel in violation of the sixth amendment to the Constitution of the United States. Specifically, the defendant claims that his trial counsel erroneously advised him to forgo presenting evidence in defense solely to preserve for review a frivolous argument that a motion for directed verdict had been improperly denied.

The record shows that defense counsel made a motion for a directed verdict and, following its denial, stated: "The law in Illinois, I believe, says that if we proceed to present evidence at this time, we may *** waive our right to raise as error on appeal, if in fact, a conviction is entered, any error which may have been committed in the denial of the motion for directed verdict. I would ask that I be allowed to speak with Mr. Barrow for I'd like to have a few minutes in private to determine whether, in fact, he wants to proceed or not." After the requested recess, defense counsel informed the court that the defendant did not wish to present evidence in his behalf.

The defendant claims that counsel's advice to forgo putting on evidence in defense was erroneous. He says that there was no validity to counsel's contention that the directed verdict motion was improperly denied, and therefore, nothing would be waived by presenting evidence. In any event, the defendant argues, even if argument on the motion for a directed verdict was waived by presenting evidence, counsel still could have argued on review that the evidence was insufficient to prove guilt beyond a reasonable doubt. The defendant also maintains that had he presented evidence in defense, there is a reasonable probability that the outcome might have been different. The defendant says he intended to testify that he had obtained the information he furnished Wrona concerning the murder of the victim from the actual perpe-

trator and that he was simply bragging to Wrona. The defendant, too, claims that he planned on calling two witnesses who would discredit the testimony of one of the prosecution's witnesses, Walter Hamlin, who placed the defendant's brother in a Cedar Point restaurant on the night of the murder. He also intended to call a witness to testify that the impression of a shoe found at the scene of the murder could not have been made by the pair of shoes found in a search of his Maryland residence.

In *People v. Albanese* (1984), 104 Ill. 2d 504, this court adopted the two-part test set out by the Supreme Court of the United States in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, to determine whether a defendant has received the effective assistance of counsel guaranteed by the sixth amendment to the Constitution of the United States. Under *Strickland,* a defendant claiming ineffective assistance of counsel must show that the advice of counsel fell outside the " 'range of competence demanded of attorneys in criminal cases' " and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068.

As to the first element of the standard, there is a strong presumption that the challenged action of counsel was the product of sound trial strategy and not of incompetence. (*Strickland v. Washington* (1984), 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065.) We cannot say that the defendant has overcome this presumption.

The record does not support the defendant's assertion that defense counsel advised him not to present evidence in defense simply to preserve for review argument on the court's denial of the motion for a directed verdict.

At a hearing on the defendant's post-trial motion, the defendant's trial counsel testified that although that was the "predominant consideration" in his decision not to present evidence in defense, he also stated that he believed the evidence the defendant could present would not "sway even one juror's mind."

McFarland testified that prior to trial, he had extended discussions with the defendant concerning the evidence or possible witnesses he could present. McFarland stated that the defendant had suggested that his brother Bruce testify and provide him an alibi, but because he appeared "burnt out" on drugs and because his testimony was not believable, McFarland decided not to call him as a witness. Although McFarland did not specify his reasons for advising the defendant not to testify or why he did not call the other witnesses the defendant suggests, the record shows that after the motion for a directed verdict was denied, McFarland moved to exclude any reference to the defendant's previous convictions, which was denied.

It is clear that counsel did not advise the defendant to forgo presenting evidence or testimony solely to preserve for review argument on the denial of the motion for a directed verdict. Rather, the record reflects a strategic decision on the part of defense counsel not to put on evidence that might have had little or no effect on the jury or that may have been harmful. In general, the decision to call particular witnesses is a matter of trial strategy, and we have stated that an ineffective assistance of counsel claim which arises from a matter of defense strategy will not support a claim of ineffective representation unless that strategy is unsound. (*People v. Madej* (1985), 106 Ill. 2d 201, 214; *People v. Haywood* (1980), 82 Ill. 2d 540, 543-44.) Therefore, even assuming counsel was incorrect in his belief that presenting evidence in defense would waive on review argument on

the denial of the motion for a directed verdict, under the circumstances, we cannot say that defense counsel's decision to advise the defendant to forgo putting on evidence in defense fell below an objective standard of reasonableness.

We note parenthetically that an election by the defendant to present evidence after a motion for directed verdict has been overruled waives any error in the trial court's ruling on the motion (*People v. Curtis* (1967), 90 Ill. App. 2d 231), except when the defendant renews the motion at the close of all the evidence (*People v. Turner* (1984), 127 Ill. App. 3d 784, 789).

In any event, assuming counsel's advice was not warranted as a matter of sound trial strategy, we do not consider that there is a reasonable probability that had the defendant presented the evidence or testimony he now suggests the outcome of the proceeding would have been different. The evidence of the defendant's guilt, including his confession, was overwhelming. Although he claims that he intended to testify and call several witnesses in his behalf, he has not submitted affidavits setting out with any degree of specificity what he would testify to or what the other witnesses he intended to call would have stated at trial. The defendant relies principally on the speculative assertion that had he testified, he may have been able to contradict Wrona's testimony by telling the jury that the actual perpetrator had told him of the events surrounding the victim's murder and that he, out of braggadocio, had said he had committed the crime. He does not, however, state who told him that he had committed the murder, and given the evidence presented by the State, it cannot be seriously contended that his testimony would have been persuasive. On the contrary, the evidence might have been considered insulting by the jury and been harmful to the defendant. Too, as stated, the defendant has previous convictions and

testifying would have brought them to the attention of the jury.

Too, even if the testimony of the witnesses the defendant names would have impeached the testimony of Walter Hamlin who placed the defendant's brother in Cedar Point on the night of the murder, or weakened the testimony concerning the shoe print found at the scene of the crime, we cannot say that the evidence would have had an appreciable effect on the jury. We cannot say that the criticized conduct of counsel, even if considered inadequate, was sufficient so to judge that there was a reasonable probability that, but for counsel's fault, the result of the trial would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065.

The defendant also argues that he was denied his sixth amendment right to effective assistance of counsel by the court's denial of his motion for substitution of counsel prior to trial. The record shows that on November 1, 1984, Wayne McFarland, the public defender of Grundy County, was appointed to represent the defendant. (The public defender of La Salle County was unable to represent the defendant due to a conflict created by his representation of the defendant's brother Bruce for the same offenses of which the defendant was convicted here.) On January 3, 1985, defense counsel filed a motion for the appointment of a special assistant defense attorney on the ground that it was unduly burdensome for him to handle the case in La Salle County as he practiced in Grundy County. The court granted the motion and appointed Daniel Bute, an assistant La Salle County public defender, as a special assistant to McFarland.

The State then filed a motion to have Bute removed on the ground that there existed a conflict of interest in his representation of the defendant. It was alleged that Bute was currently representing the sheriff of La Salle

County in various civil matters; that his law partner had previously represented the victim's son (who was called as a witness for the State at trial) in a real estate transaction; and that he had previously represented prosecution witness Hockings in a divorce proceeding. The State argued that Bute would be precluded from adequately cross-examining those witnesses and therefore his representation of the defendant would be deficient. At a hearing on the State's motion, the court admonished the defendant of the possible conflict posed by Bute's representation, and the defendant stated that he was willing to waive his right to complain of any possible conflict. The court found that the defendant's waiver was voluntary, knowing, and intelligent and denied the State's motion.

On April 30, 1985, a week prior to the scheduled commencement of trial, the defendant filed a motion to permit McFarland to withdraw as counsel and substitute Bute as counsel of record. In support, McFarland stated that he had recently resigned as Grundy County public defender and that the trial would conflict with "family matters which are to take place starting on June 8th." The court denied the motion, stating that it was untimely, having been raised on the eve of trial. The court also stated that although Bute was very capable of handling the case, he had been appointed only to relieve McFarland of the trips to La Salle County for trial preparation and not to participate at trial. On May 2, the defendant filed a motion to continue Bute's representation through the trial, which was also denied.

The defendant argues that the trial court abused discretion in failing to permit Bute to become counsel of record at trial or to continue to assist McFarland at trial. He claims that the court's denial of both requests improperly interfered with his attorney-client relation-

ship and left him with ineffective counsel in violation of the sixth amendment.

Although the sixth amendment guarantees an accused the right to assistance of counsel in a trial for certain types of crimes, it does not include the right to select counsel of choice, particularly where the exercise of that claimed right would delay or impede the effective administration of justice. (*People v. Hall* (1986), 114 Ill. 2d 376, 403; *People v. Taylor* (1984), 101 Ill. 2d 508, 523; *People v. Friedman* (1980), 79 Ill. 2d 341, 349.) The record shows that Bute may not have been able to properly cross-examine several of the State's witnesses at trial due to prior and existing relationships with those witnesses. Too, Bute was appointed solely to aid McFarland in pretrial preparation, and consequently, as the defendant's motion was made on the eve of trial, it can reasonably be assumed that Bute would not be adequately prepared for trial, thus causing a delay of trial. The defendant offered no persuasive reasons for substituting counsel and we cannot say that the trial court abused discretion in denying the defendant's request to substitute Bute as counsel of record. See *People v. Hall* (1986), 114 Ill. 2d 376, 402.

The defendant argues that he was willing to waive his right to conflict-free counsel, and because Bute had been appointed early in the proceedings, and was familiar with the case and willing to substitute as lead counsel of record for McFarland, there was no proper reason to refuse his request.

The defendant is correct in his contention that an accused may waive his right to the sixth amendment guarantee to conflict-free representation by counsel. It does not follow, however, that the court must accede to accused's willingness to waive the conflict. This was made clear by the Supreme Court in *Wheat v. United States*

(1988), 486 U.S. 153, 100 L. Ed. 2d 140, 108 S. Ct. 1692.

In *Wheat,* the defendant was charged with participating in a drug-distribution conspiracy. Two days prior to trial, he requested that an attorney, who also represented two of his codefendants, represent him in place of his original counsel. The prosecution objected on the ground that the attorney's representation would create a conflict of interest in that the defendant might be called to testify against one of his codefendants and that the prosecution had asked that the other codefendant be made available to testify at the defendant's trial. Although the defendant stated that he was willing to waive any objection to potential conflicts that may arise, the court denied his motion for substitution of counsel.

On *certiorari,* the Supreme Court held that the trial court did not abuse discretion in denying the defendant's motion for substitution of counsel. The Court rejected the defendant's argument that his waiver cured any problem created by the potential conflict, stating that "courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession" and that "their judgments remain intact on appeal." (486 U.S. at 160-61, 100 L. Ed. 2d at 149-50, 108 S. Ct. at 1697-98.) The Court pointed out that if a court accepts a proffer of waiver of a conflict created by multiple representation, a defendant could thereafter claim he did not receive effective assistance of counsel if the advocacy of counsel is impaired by the conflict. On the other hand, if the court refuses to accept the waiver, and insists that the defendants be separately represented, the defendant can claim error in being denied his counsel of choice. The court would then "face the prospect of being 'whipsawed' by assertions of error no matter which way they rule." (486 U.S. at 161, 100

L. Ed. 2d at 150, 108 S. Ct. at 1698.) Concluding, the Court stated:

> "[W]e think the District Court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses. In the circumstances of this case, with the motion for substitution of counsel made so close to the time of trial the District Court relied on instinct and judgment based on experience in making its decision. We do not think it can be said that the court exceeded the broad latitude which must be accorded it in making this decision." 486 U.S. at 163, 100 L. Ed. 2d at 151, 108 S. Ct. at 1699.

Although we are not confronted with a case of multiple representation as that presented in *Wheat*, the Court's reasoning is persuasive here. As stated, a potential conflict of interest existed in Bute's representing the defendant, which may have precluded him from properly cross-examining certain witnesses the State indicated it may call at trial. Although the defendant waived his right to conflict-free counsel, the court appointed Bute only to assist in trial preparation. Presumably, it was the court's belief that the potential conflict would not affect Bute's representation of the defendant in matters concerning pretrial preparation. Given these circumstances, we cannot say that the trial court erred in denying the defendant's motion for substitution of counsel.

The defendant also asserts that there was error in the trial court's refusal to continue Bute's appointment into trial. He contends that "the relevant facts pertaining to this argument suggest that the trial court's refusal *** was based on financial concerns."

The defendant again has offered no persuasive reason why it was necessary to have Bute assist McFarland at

trial. In any event, the defendant has failed to show that he was prejudiced by his trial counsel's performance. As the Supreme Court of the United States declared in *Wheat v. United States* (1988), 486 U.S. 153, 100 L. Ed. 2d 140, 108 S. Ct. 1692, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." (486 U.S. at 159, 100 L. Ed. 2d at 148, 108 S. Ct. at 1697. See also *Morris v. Slappy* (1983), 461 U.S. 1, 13-14, 75 L. Ed. 2d 610, 620-22, 103 S. Ct. 1610, 1617-18; *Jones v. Barnes* (1983), 463 U.S. 745, 77 L. Ed. 2d 987, 103 S. Ct. 3308.) The record shows that the defendant received effective assistance of counsel throughout the guilt phase of trial. Counsel vigorously cross-examined witnesses, made numerous motions and posed objections when appropriate. We judge there was no error in the court's denial of the defendant's motion to permit Bute to assist at trial.

Another contention of the defendant is that the trial court erred by failing to suppress inculpatory statements he made to prosecution witness Harold Wrona in a hotel room in Maryland which were recorded by Maryland law enforcement officials through the use of eavesdropping equipment.

The record shows that Wrona made an agreement with Illinois and Maryland law enforcement officials to cooperate in prosecuting the defendant for O'Berto's murder. He thereafter signed a written consent form to permit members of the Maryland State police to use eavesdropping equipment to record a conversation between the defendant and himself where the defendant would be encouraged to incriminate himself concerning O'Berto's murder. On April 6, 1984, Wrona met the

defendant in a Maryland hotel room which was set up with hidden audio and video equipment. Illinois State Trooper Harry Hockings played the role of Wrona's friend who had purportedly provided a bond to obtain Wrona's release. From an adjoining hotel room members of the Maryland State police recorded the conversation and the defendant was arrested shortly thereafter.

The defendant contends that the actions of the Illinois and Maryland State police constituted eavesdropping in violation of section 14—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 14—2) and, therefore, any statements obtained as a result were inadmissible under section 14—5. Section 14—2 provides that a person commits the offense of eavesdropping when he:

> "(a) Uses an eavesdropping device to hear or record all or any part of any conversation unless he does so (1) with the consent of all the parties to such conversation or (2) with the consent of any one party to such conversation and in accordance with Article 108A of the 'Code of Criminal Procedure of 1963', approved August 14, 1963, as amended; or
>
> (b) Uses or divulges, except as authorized by Article 108A of the 'Code of Criminal Procedure of 1963', approved August 14, 1963, as amended, any information which he knows or reasonably should know was obtained through the use of an eavesdropping device." (Ill. Rev. Stat. 1983, ch. 38, par. 14—2.)

Section 14—5 provides that any evidence obtained in violation of section 14—2 is "not admissible in any civil or criminal trial." Ill. Rev. Stat. 1983, ch. 38, par. 14—5.

We cannot agree with the defendant's contention that the actions of the members of the Illinois and Maryland State police constituted eavesdropping in violation of section 14—2 so that the evidence obtained must be excluded under section 14—5. The eavesdropping of the defendant's conversation with Wrona occurred entirely within Maryland and was conducted primarily by mem-

bers of the Maryland State police. Since the eavesdropping was conducted entirely within the borders of Maryland, there can be no violation of section 14—2. It is clear that where an act claimed to be criminal takes place outside of Illinois, an Illinois circuit court has no jurisdiction. (*People v. Pitt* (1982), 106 Ill. App. 3d 117, 118; *People v. Bovinett* (1979), 73 Ill. App. 3d 833, 835.) Consequently, the defendant cannot invoke section 14—5 to have evidence of the act held inadmissible.

The defendant, however, asserts that the admissibility of evidence is controlled by the law of the forum or trial State. Therefore, he contends, even though the eavesdropping here occurred in Maryland, because the actions of the Maryland and Illinois authorities violated the proscriptions in section 14—2, section 14—5 should render his statements inadmissible.

In *People v. Gaines* (1981), 88 Ill. 2d 342, this court held that evidence acquired through eavesdropping is excluded only if the acquisition constituted a criminal offense. (See also *People v. Kurth* (1966), 34 Ill. 2d 387, 396 (concurring opinion by Justice Schaefer).) Unlike our law, Maryland law permits the admission of evidence obtained by eavesdropping with the consent of a single party to a conversation. (See Md. Cts. & Jud. Proc. Code Ann. §10—402(c)(2) (1984).) Accordingly, because the eavesdropping here was conducted legally outside of Illinois, section 14—5 does not render the defendant's statements inadmissible.

The question is not novel. In other jurisdictions courts have held that evidence gathered by police officers of a foreign State, and in accordance with the laws of that State, is properly admitted at trial, although the complained-of actions of the police would violate that State's eavesdropping statute. (See *State v. Mayes* (1978), 20 Wash. App. 184, 579 P.2d 999; *Commonwealth v. Bennett* (1976), 245 Pa. Super. 457, 369 A.2d 493;

*Commonwealth v. Corbo* (1982), 295 Pa. Super. 42, 440 A.2d 1213.) In *Mayes*, a California police officer testified concerning certain telephone conversations he overheard by listening on an extension line without the consent of the caller. The calls were made within the State of California and the participants were residents of that State. It was undisputed that if the calls had been made in the State of Washington, the officer's testimony would have been inadmissible under a Washington statute which prohibits the use in court of all evidence obtained by wiretap or electronic surveillance except where the parties had consented to the wiretap or electronic surveillance. The court upheld the trial court's refusal to suppress the testimony, stating that the eavesdropping statute "does not exclude from the courtroom all information obtained from private phone conversations; it only excludes *illegally* obtained information." (Emphasis in original.) *Mayes*, 20 Wash. App. at 193, 579 P.2d at 1004, citing *State v. Wanrow* (1977), 88 Wash. 2d 221, 233, 559 P.2d 548, 555.

We hold that evidence legally obtained through eavesdropping which occurs within the borders of another State is not inadmissible under section 14—5. The trial court, therefore, correctly denied the defendant's motion to suppress his tape-recorded confession.

The defendant also claims that defense counsel's performance was deficient for his failure to make a motion to delete or edit portions of his tape-recorded confession given to Wrona in Maryland that contained statements of the defendant pertaining to allegedly irrelevant and prejudicial matters. On the tape, in addition to detailing the events surrounding the robbery and murder of O'Berto, the defendant told Wrona of an incident involving him and his brother Bruce in which they were robbed by two prostitutes. The event apparently occurred just prior to the time Bruce was picked up by a

La Salle County police officer for a traffic offense. Although we agree with the defendant that portions of the conversation stray into areas that are irrelevant and prejudicial, that part of the conversation was nevertheless relevant to corroborate the defendant's statements to Wrona placing the defendant and his brother in Cedar Point at or around the time of the murder.

The tape also contains statements by the defendant concerning excessive drinking and the armed robbery that he was convicted of in Maryland in 1980. In reference to the robbery, the defendant told Wrona that he "should have taken care of the witnesses." While this evidence may have been irrelevant, we cannot say that, standing alone, the evidence was so prejudicial that the defendant was denied effective assistance of counsel by his having failed to make a motion to have that portion of the tape deleted. The jury was already aware that the defendant had been convicted of armed robbery through his statements which were read to the jury. The remark about taking care of the witnesses was an isolated comment that undoubtedly would have been difficult to excise. Too, although there was considerable profanity on the tape, given the fact that it occurred in practically every spoken sentence, it undoubtedly would not have been possible to excise those statements from the tape without destroying its meaning.

The defendant next contends that he was denied a fair trial by certain remarks by the trial court during jury selection. He says that the court, in its introductory remarks to prospective jurors, stated that after they were to determine the guilt or innocence of the defendant, "they would be asked to go back and deliberate on the death penalty." The defendant maintains that the judge's remarks improperly conveyed the impression that he expected the defendant would be found guilty

and consequently a death penalty hearing would be necessary.

The State argues that the defendant has waived any challenge to the court's remarks on the ground that he failed to make an objection at trial. While in general both an objection at trial and a written post-trial motion raising the issue are required to preserve that issue for review (*People v. Enoch* (1988), 122 Ill. 2d 176), this court has held that a less rigid application of the waiver rule prevails where misconduct of the trial judge is involved (*People v. Tyner* (1964), 30 Ill. 2d 101, 105; *People v. Sprinkle* (1963), 27 Ill. 2d. 398, 399-400). Apart from this consideration, the defendant contends that his trial counsel was deficient by failing to object to the court's remarks. We will review the point.

We agree with the defendant that the court should have told the jurors that *if* they found the defendant guilty, a sentencing hearing would be held. We cannot say, however, that the court's remarks can reasonably be construed as an expression of opinion as to the defendant's guilt or innocence. The court specifically told the jurors that they were to determine the guilt or innocence of the defendant, and any error was cured by the trial judge's instructions that the defendant was presumed innocent and that the State was required to prove guilt beyond a reasonable doubt. We do not consider that the judge's misspoken remarks were so prejudicial as to deny the defendant a fair trial.

It is the defendant's next contention that the trial court erred in admitting into evidence several pieces of mail that the defendant, while in custody in Maryland, sent to his brother Bruce, who was incarcerated at the La Salle County jail. One exhibit is an envelope addressed to Bruce Barrow in which the defendant had drawn a "caricature" of a rat in the jaws of a skull. The rat is labeled "Smokie," Wrona's nickname, and around

the skull are various words and phrases, including "Paybacks," "A Bitch" and "F.T.W." The other exhibit is a copy of a picture of a man lying on his back, apparently under three to four feet of water, with the word "Smokie" written across his forehead.

Prior to trial, the defendant filed a motion *in limine* to preclude the admission of the exhibits. The trial court denied the motion, stating that the exhibits were probative to show that the defendant was attempting to intimidate a witness, suggesting consciousness of guilt. The court also stated that the exhibits were relevant in that they corroborated statements the defendant made to prosecution witness Harold Wrona in the Maryland hotel room concerning a previous robbery where the defendant, as stated above, said he should have taken care of the witnesses to the offense.

We agree with the defendant that the trial court abused its discretion in admitting the complained-of exhibits. They were plainly irrelevant to a determination of the defendant's guilt or innocence. Relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Fed. R. Evid. 401; *People v. Monroe* (1977), 66 Ill. 2d 317, 322.) " 'Relevancy is established where a fact offered tends to prove a fact in controversy or renders a matter in issue more or less probable.' " *People v. Free* (1983), 94 Ill. 2d 378, 413, quoting *Marut v. Costello* (1966), 34 Ill. 2d 125, 128.

While an attempt to intimidate or influence a witness is relevant for the purpose of showing consciousness of guilt (*People v. Gambony* (1948), 402 Ill. 74, 80; *People v. Spaulding* (1923), 309 Ill. 292, 306), there is nothing in the record here to suggest that the defendant was attempting to influence a witness by sending the letters to his brother, who was incarcerated in the La Salle County

jail. The State made no showing that the defendant intended that the exhibits were to be seen by anyone other than his brother. Too, as Bruce was in custody at the time, it cannot be argued that the letters were intended as a direction to Bruce to attempt to intimidate the witness. Evidence which depends on unproven assumptions is inadmissible. (*People v. Newbury* (1972), 53 Ill. 2d 228, 239; *People v. Jones* (1982), 108 Ill. App. 3d 880, 884.) At most, the exhibits show that the defendant had a dislike of Wrona, which, under the circumstances, regardless of the defendant's culpability, was understandable. Nor are these exhibits properly admitted on the ground that they were relevant as evidence of defendant's bad character. The prosecution may not present evidence of a defendant's bad character unless the defendant first introduces evidence of his good character. See *People v. Lewis* (1962), 25 Ill. 2d 442, 445; *People v. Willy* (1921), 301 Ill. 307, 317.

Whatever probative value the exhibits might have had was clearly outweighed by their prejudicial impact, and we hold that admitting them was improper. Although the admission of the exhibits was erroneous, we do not consider, given the fully convincing evidence of guilt, that the defendant was denied a fair trial. The jury could understand that the defendant harbored resentment against Wrona for cooperating with police and for testifying against him. Also, contrary to the defendant's contentions, we see nothing in the record to indicate that the State misled the jury into believing that the defendant was attempting to intimidate the witness. There was no reversible error.

The defendant argues, too, that the trial court abused discretion in refusing his request to read a newspaper article that was published in the La Salle-Peru area during trial and to poll the jurors to determine whether any had read the article and whether they may have been

prejudiced by its contents. During trial, defense counsel brought the article to the attention of the court. He did not offer a copy of the article to the court, but he told the court:

> "The May 23rd issue of the News-Tribune, which I believe is published in the La Salle-Peru area, contained an article, *** which depicted plea negotiations and suggested and speculated that plea negotiations were taking place, and that they could either lengthen or shorten the time of trial.
>
> * * *
>
> As I sit here, I've not interviewed the twelve jurors and the two alternates, and I have no idea whether any of them have read the paper or have any knowledge of the contents; however, I believe that it's essential that that determination be made and I do believe that if the information has come to any of the jurors now, that no instructions or admonition at this point could satisfactorily remove the taint of such an article from the jury."

The court denied the motion, stating that although it had not read the article, it had earlier admonished the jury not to read any newspaper articles and that it had "faith that they [the jurors] will follow their oaths as jurors and there is no showing that they did not."

The defendant claims that the court erred in relying on its admonishments to the jurors not to read any media accounts of the trial and, although he did not offer a copy of the article to the court, in failing to read the article to determine whether the content of the article was sufficiently prejudicial to warrant polling the jurors as to whether any had read the article.

Whether a jury should be questioned about an allegedly prejudicial newspaper article rests in the sound discretion of the trial court. (*People v. Sundaresh* (1987), 153 Ill. App. 3d 930, 935.) In exercising that discretion, a court should consider the nature of the publicity, its content and its potential for prejudice. Only if the court

determines that the publicity is prejudicial is it required to poll the jury concerning the article. See *People v. Cox* (1966), 74 Ill. App. 2d 342, 346-47.

The defendant, however, failed to present the article to the court, and consequently, it was effectively precluded from evaluating whether it was prejudicial. The defendant argues that, because he informed the court that plea negotiations were mentioned in the article, prejudice must be presumed even though he did not tender a copy of the article to the court. His contention overlooks that this court has held that the unsworn statement of defense counsel as to the contents of allegedly prejudicial newspaper articles is an insufficient foundation to show prejudice. *People v. Harrison* (1943), 384 Ill. 201; *People v. Herbert* (1930), 340 Ill. 320.

Moreover, any attempt to have questioned the jurors to ascertain whether they had read the article would have disclosed the fact there was an article to the entire jury. This is particularly significant in light of counsel's arguing to the court that the content of the article was so prejudicial that if any of the jurors had read the article, a mistrial would be warranted.

In any event, we have examined a copy of the article and find that even if the jurors had read the article, its contents were not so prejudicial as to deny the defendant a fair trial. In addition to recounting the evidence presented, the article simply states:

"The expected lengthy trial of Ronald Barrow on murder charges could be a little longer as a result of a delay today—or it could be shorter.

\* \* \*

Instead of resuming testimony at 10:00 a.m. as scheduled, La Salle County First Assistant State's Atty. Gary Garretson asked O'Berto Family members to step outside the courtroom to go to another office.

This lead to speculation a plea bargain might be reached between the prosecution and defense, thus shortening the trial. Or, if the agreement fails, the discussion might lengthen the trial."

It must also be remembered that adequate warnings were given to the jury at the start of trial that they should not read, listen to or watch any media accounts of the trial. They were admonished in a similar manner repeatedly throughout the trial. Since it does not appear that the defendant was prejudiced by the publication of the article, the court did not err in denying the motion to declare a mistrial. For the same reason, we cannot agree that the failure of defense counsel to furnish the court with a copy of the article represents a professional deficiency in performance sufficiently serious as to warrant reversal under *Strickland.*

The defendant also claims that his convictions should be reversed and a new trial ordered because of remarks made by the trial judge and the prosecution at the guilt phase of trial.

First, the defendant says that the prosecutor misstated and minimized the reasonable doubt standard by telling the jurors during *voir dire* and closing argument that they need not prove guilt "beyond all doubt" or "beyond a shadow of a doubt." In *People v. Edwards* (1973), 55 Ill. 2d 25, 35, the prosecutor made similar remarks to the jury, stating that a reasonable doubt is determined by the standard of "reasonableness" and was not the same as "beyond any doubt" or "beyond any possible doubt." This court rejected the argument that the prosecutor's remarks minimized the reasonable doubt standard and held that while "it would have been better practice not to attempt to define the term 'reasonable doubt' either in *voir dire* or closing argument, no error resulted which requires reversal." 55 Ill. 2d at 35.

Similarly, because the jury was properly instructed on reasonable doubt, and it must be presumed that the jurors followed the court's instructions (see *People v. Bell* (1983), 113 Ill. App. 3d 588, 601), any error occasioned by the prosecutor's remarks would have been cured by the jury instruction. We cannot say that the defendant was denied a fair trial by the remarks.

The defendant also argues that he was denied a fair trial because the prosecutor and the trial judge told potential jurors during *voir dire* that the credibility of prosecution witness Harold Wrona was to be judged by the same standard as any other witness. The record shows that Wrona was twice convicted of burglary, once in Illinois in 1971 and once in Maryland in 1983. During *voir dire*, the prosecutor repeatedly stated that "the law requires that the convicted felon's testimony be judged by the same standards as other witnesses'." Similarly, the trial judge told the prospective jurors that they were to "judge all witnesses in this case by the same criteria, be it doctor, lawyer, Indian chief, or a layman."

The defendant argues that the jurors were improperly misled into believing that a witness' prior felony convictions do not reflect on credibility.

Certain prior convictions may properly be considered in evaluating the credibility of a witness. Indeed, Illinois Pattern Jury Instructions, Criminal, No. 3.12 (2d ed. 1981) specifically provides that certain prior convictions can be considered in evaluating a witness' veracity. The record shows that defense counsel submitted that instruction but withdrew it. As a general proposition the court is under no obligation to give instructions not tendered. (*People v. Enoch* (1988), 122 Ill. 2d 176; *People v. Gaines* (1981), 88 Ill. 2d 342, 366-67.) Also, defense counsel, in his opening statement to the jury, stated that "[i]t's obvious at this point that Mr. Wrona was incarcerated. He's a convicted felon. You're going to judge his

testimony by the same standard as everybody else." The defendant waived the issue for review. *People v. Yates* (1983), 98 Ill. 2d 502, 533.

In any event, we cannot agree with the defendant that the complained-of remarks served to mislead the jurors into believing that they could not consider Wrona's prior convictions as bearing on his credibility as a witness. The record shows that, although defense counsel told the jury that Wrona's testimony was to be judged as that of any other witness, he did argue that Wrona had been convicted, that he had made a deal with the State in exchange for cooperating with the police and that he should not be believed. We find no reversible error.

The defendant complains, too, of extensive remarks by the prosecution in its opening and closing arguments that the State's case was "uncontradicted." The record shows that in arguing to the jury in closing, the prosecutor used the phrase "uncontradicted" numerous times. For example, the prosecutor told the jury:

> "Another thing that has to be answered is how did the defendant get all the facts concerning the crime? Got them at the crime scene, obviously, and that's evidence that the defendant has to deal with.
>
> * * *
>
> The defendant goes to the privacy of a motel room to talk to Harold Wrona. He doesn't know Harold Wrona is obviously wired. He goes there to talk to him. The defendant can say anything that he wants to say. It's the defendant's own words. It's uncontradicted."

Embellishing upon this theme, during rebuttal argument, the prosecutor stated:

> "No one is going to apologize for that agreement, ladies and gentlemen of the jury, a murder was being investigated. Harold Wrona had the facts concerning that murder. Those facts checked out. They were uncontradicted and they remain uncontradicted to this day."

The defendant made no objections to these comments, and any question regarding them has been waived unless it is " 'plainly apparent that an error is so prejudicial that real justice has been denied or that the verdict of the jury may have resulted from the error.' " *People v. Adams* (1985), 109 Ill. 2d 102, 123, quoting *People v. Yates* (1983), 98 Ill. 2d 502, 533.

The defendant correctly argues that comments of a prosecutor as to a defendant's decision not to testify at trial, in general, violate the defendant's right against self-incrimination. (See *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229.) The State may, however, comment that its case is uncontradicted, "for this involves no more than an accurate summary of the evidence." (*People v. Hopkins* (1972), 52 Ill. 2d 1, 6.) This is true even if the only one who could contradict the State's evidence is the defendant. *People v. Mills* (1968), 40 Ill. 2d 4, 8-9; *People v. Birger* (1928), 329 Ill. 352.

It is often not easy to determine the line between permissible comments on evidence or testimony that stands uncontradicted and references to a defendant's failure to testify. In *People v. Dixon* (1982), 91 Ill. 2d 346, this court stated the appropriate test for making this determination is whether " 'the reference [was] intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify.' " 91 Ill. 2d at 350, quoting *People v. Hopkins* (1972), 52 Ill. 2d 1, 6. See also *People v. Mills* (1968), 40 Ill. 2d 4, 8.

We cannot say that the purpose and effect of the prosecutor's statements were intended to direct the attention of the jury to the defendant's failure to testify. The defendant presented no evidence whatever in defense, and this court has held that a prosecutor's re-

marks that the State's case stands uncontradicted do not amount to a reference that the defendant has failed to testify. See also *People v. Bey* (1972), 51 Ill. 2d 262, 266; *People v. Norman* (1963), 28 Ill. 2d 77.

Furthermore, this was not a situation in which only the defendant could have contradicted the State's case. The defendant could have called his brother or other witnesses to contradict the State's evidence. Thus, it cannot be said that the "prosecutorial design appears to have been to point the finger of blame directly at the defendant for his failure to testify when it was within his power to enlighten the jury." (*People v. Mills* (1968), 40 Ill. 2d 4, 9.) We would note, too, that the court instructed the jury pursuant to defense counsel's request that "the fact that a defendant did not testify should not be considered by you in any way in arriving at your verdict." Under these circumstances we find no reversible error. See *People v. Dixon* (1982), 91 Ill. 2d 346, 351; *People v. Bey* (1972), 51 Ill. 2d 262, 266-67.

The defendant next complains of the prosecutor's remarks that the jurors must find the defendant guilty to meet their sworn oaths as jurors. Specifically, the defendant complains of these remarks of the prosecutor in rebuttal argument:

> "Ladies and gentlemen, you—and you remember so well, you took an oath, and you're going to be called upon to return verdicts of guilty on each and every count in this case because the People's proof has been beyond a reasonable doubt. We have exceeded that. We have given you a case that is uncontradicted.
>
> * * *
>
> And your oath, and you remember, do each of you solemnly swear you will well and truly try the matter now at issue and a true verdict render according to the evidence and instructions as given you by the Court, so help you God.

> That was your oath. You took it very serious, and, ladies and gentlemen of the jury, the only way that you can meet that responsibility, because the true verdict rendered, the true verdict is the verdict supported by the evidence in this case, and the only way that you will meet and stand up to that obligation, that oath, is by returning verdicts of guilty on each and every count."

The defendant argues that the remarks improperly misled and pressured the jury to return a guilty verdict, thus denying him due process.

No objection was made, however, until after the prosecution had completed argument, and the issue, therefore, was waived for want of a timely objection. In any event, we cannot say that the comments were improper. In context, the prosecution's remarks can reasonably be construed as a comment on the evidence and strength of the State's case, which is permissible. (*People v. Yates* (1983), 98 Ill. 2d 502, 532; *People v. Tiller* (1982), 94 Ill. 2d 303, 318-19.) The State may comment on the evil effects of crime and urge a fearless administration of the law. *E.g.*, *People v. Owens* (1984), 102 Ill. 2d 88, 105-06; *People v. Jackson* (1981), 84 Ill. 2d 350, 360; *People v. Wright* (1963), 27 Ill. 2d 497, 500-01.

*United States v. Young* (1985), 470 U.S. 1, 84 L. Ed. 2d 1, 105 S. Ct. 1038, which the defendant cites, is distinguishable. There, the prosecutor told the jury:

> "I don't know whether you can call it honor and integrity, I don't call it that, [defense counsel] does. If you feel you should acquit him for that its your pleasure. I don't think you're doing your job as jurors in finding facts as opposed to the law that this Judge is going to instruct you, you think that's honor and integrity then stand up here in Oklahoma courtroom and say that's honor and integrity; I don't believe it." 470 U.S. at 5-6, 84 L. Ed. 2d 1, 6, 105 S. Ct. 1038, 1041.

Unlike in *Young*, the prosecutor here was simply telling the jury that they were required to reach a verdict based on the evidence.

The defendant also argues that the circuit court improperly permitted the State to make references to and elicit testimony concerning the family of the deceased throughout the guilt phase of trial. He concedes that the testimony of Darlene and Howard Brown was relevant to explain the probable time of the offenses, the discovering of the body and what property of the victim was missing. The defendant argues, however, that the prosecution needlessly elicited testimony from the witnesses that the victim had three children and that he had lived alone since 1965, when his wife passed away. He also complains of the testimony of Dr. Albert O'Berto, the victim's son, who told the jury that the victim required a hearing aid and that he was a very physically active man for the age of 86.

The testimony of the victim's family was highlighted, he says, by the prosecution's opening arguments to the jury in which he reminded them that the victim was a widower and had raised three children. No objection was made to the comments in opening argument. In closing, the prosecutor told the jury:

> "O'Berto was a widower, lived alone, was eighty-six years old, self employed, ran a lumber yard and a power company, and even though he was eighty-six years old, he was very active."

Defense counsel made an objection to the prosecution's remarks in this argument, but the court overruled the objection. Later in his argument the prosecutor referred to the victim's son, stating that he had a "unique relationship" with the victim.

The defendant claims that the testimony of the victim's family and the prosecutor's comments were an improper appeal to the emotions of the jurors and served

to deny him a fair trial. Save for objecting to the above-quoted comment on the victim, however, the defendant made no objection to the testimony or argument referred to nor did he raise the issue in his motion for a new trial, thus waiving the issue for review. *People v. Walker* (1985), 109 Ill. 2d 484, 504.

In any event, we do not consider that the impropriety of complained-of testimony and comments by the prosecutor was that clear. That the victim left a family was a matter obvious from evidence properly before the jury. The State, of course, may call a "life and death witness to establish that the victim of a homicide had been alive prior to the events leading to the prosecution of the defendant." *People v. Speck* (1968), 41 Ill. 2d 177, 201.

Evidence concerning the deceased's family is also admissible to the extent it is "necessarily involved in the proper presentation of the State's case." (*People v. Jayne* (1977), 52 Ill. App. 3d 990, 1010. See also *People v. Cunningham* (1984), 130 Ill. App. 3d 254, 266; *People v. Lee* (1980), 86 Ill. App. 3d 922, 937.) Evidence that the victim lived alone was relevant to the State's case because the evidence showed that there were no signs of forced entry into the victim's home, and therefore it was important to rule out the possibility that someone who lived with the victim committed the murder. Too, the testimony of the victim's son with respect to the victim's physical ability and his work habits was proper in that it corroborated the defendant's account of the murder that he gave to Wrona. According to Wrona's testimony, the defendant told him that he watched the victim's house for a week and noticed that he was gone during the day and was home at night. The testimony of Dr. O'Berto, the victim's son, that he wore a hearing aid was also corroborative of the defendant's statements. The defendant had told Wrona that he asked the victim where the money was but "he couldn't hear him." The victim was

found without his hearing aid. We cannot say that the testimony and argument concerning the victim's family was improper.

Having found no error sufficient to warrant reversal of the defendant's convictions, the judgment of conviction is affirmed. We next consider the defendant's complaints of error in the sentencing phase of the proceeding.

The defendant claims that he was denied a fair sentencing hearing because of remarks of the prosecutor during the second phase of the hearing that he says were designed to elicit the jury's sympathy for the victim and his family. Specifically, the defendant complains of the following remarks:

> "He stalked and watched the man's home, the eighty-six year old man's home, for a week. A hard working, eighty-six year old widower who had three children. A man who was hard of hearing. A man who you've learned had cancer, worked every day in his business. A man who left his home regularly during the day to make deliveries. A man that was home at night.
>
> Ron Barrow found his prey, Joseph O'Berto, a prominent member of the community. A man who had achieved eighty-six years of age. A man who fortunately had the pleasures of his daughter visiting him the night before his demise in his basement, she had a chance to spend with him before he burrows in the front door, wielding a gun, using his cunning ways to get the old man to open the front door.
>
> * * *
>
> You've had the benefit of that to see, to look at his future actions, what he intends to do based on his own words, what valuable insight you've been given and provided to this cold-blooded, heartless person who preys upon the old, the weak, who entered Cedar Point, left that community shocked, amazed that one of their own in the serenity of the night, came to his execution in the basement of his home, being robbed of the chance to say

goodbye to his family and friends, dying of cancer, hard of hearing, crying, being whipped on."

The State correctly points out that the defendant did not make objection to the prosecutor's comments which, of course, constituted a waiver of the question on appeal. (*People v. Adams* (1985), 109 Ill. 2d 102, 116.) Since the defendant claims that defense counsel's failure to object to the testimony denied him the effective assistance of counsel, and as the objected-to argument was emotional and florid, we elect to review the defendant's contention (see *People v. Emerson* (1987), 122 Ill. 2d 411, 434; *People v. Stewart* (1984), 104 Ill. 2d 463, 493; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 65), but will limit our review to whether the failure to object constituted plain error (*People v. Gacho* (1988), 122 Ill. 2d 221).

The prosecution's references to the victim's having raised three children and his living alone, as stated, could reasonably be regarded as simply a comment on evidence already properly before the jury. Other comments by the prosecutor were improper: the reference to the victim's wife dying, the remarks about the character and other qualities of the victim, such as that he was a "prominent member of the community" and that he was "hard working," and the statement that the victim was dying of cancer, particularly considering there was no evidence in the record of this.

Unlike the defendant, we cannot regard that these unobjected-to references require reversal as plain error. (See *People v. Salazar* (1988), 126 Ill. 2d 424.) Unlike the cases in some decisions of this court where comments regarding the victim's family required reversal of the conviction, the prosecutor did not dwell on the actual or supposed reaction of the victim's family. (*People v. Hope* (1986), 116 Ill. 2d 265, 278; *People v. Bernette* (1964), 30 Ill. 2d 359, 372.) The references were isolated and of a very minor significance in light of the entire ar-

gument. It cannot be sensibly contended that the evidence was presented in such a manner as to cause the jury to believe it was material to the determination of guilt or innocence. (See *People v. Bartall* (1983), 98 Ill. 2d 294, 323; *People v. Free* (1983), 94 Ill. 2d 378, 413-15; *People v. Jordan* (1967), 38 Ill. 2d 83, 92.) Where it appears that remarks, though improper, are of such a minor character that prejudice to the accused is not their probable result, the verdict of guilty will not be disturbed. (*People v. Clark* (1972), 52 Ill. 2d 374; *People v. Berry* (1960), 18 Ill. 2d 453.) We conclude beyond a reasonable doubt that the testimony and argument concerning the victim's family did not deprive the defendant of the constitutional right to a fair trial.

The defendant further contends that there was error when the prosecutor told the jury during the first phase of the sentencing proceeding, wherein the prosecution sought to establish the defendant's eligibility for the death penalty:

> "I know that you have taken your oath as jurors so very, very seriously. And you will not turn from that oath now. You will not turn from that responsibility at this time. And you will allow us through your finding of eligibility to proceed to the next stage and to show you the aggravating factors as to why the imposition of death is the appropriate sentence in this case."

At the second stage of the death penalty hearing, where the prosecution was to show that the aggravating evidence outweighed the mitigating evidence, the prosecutor spoke again of duty, stating:

> "The faithful performance of your duties as a juror is vital to the administration of justice, ladies and gentlemen. The only justice that can be done in this case is for this Court to be able to sentence this cold-blooded, calculated, premeditated murderer, who left Joseph O'Berto executed in his basement, to death."

In rebuttal, the prosecutor continued:

> "You've taken an oath and I know as I discussed with you during the other stages, you will not turn from your oath. You will not take the easy way out because you have an obligation. You have an oath. You have responsibility. Our society counts on the jury system, the jury process. You were chosen for this case, a special case, to decide, based on the evidence that you heard in the courtroom.
>
> * * *
>
> Ladies and gentlemen of the jury, you stand between the likes of that murderer and society. You have a responsibility, as I indicated, and you will not turn from that responsibility. You will not turn from your oath.
>
> There is only one decision that the evidence has supported in this case. There's only one decision that is right. It's right based on the evidence. That's what you have to decide this case on. You're not going to decide it on emotion, you're going to decide it on the evidence and there has been no mitigating factor presented to you. No mitigating factors presented to you to preclude the imposition of death. You know that. The evidence has supported that.
>
> Ladies and gentlemen, when you make that decision, your job will be done."

The defendant claims that the argument misled and unduly pressured the jury to return a death sentence. Again the defendant made no objection to what he now complains of and thus has waived the issue for review. (*People v. Walker* (1985), 109 Ill. 2d 484, 504.) In any event, the defendant's contentions are not convincing.

It is not plausible to say the remarks had the effect of diverting the jury's attention from its consideration of the aggravating and mitigating factors. As stated, the State may comment on the evil effects of crime and urge the fearless administration of the law. (See *People v. Owens* (1984), 102 Ill. 2d 88, 106.) The remarks here are not unlike those in *People v. Lego* (1987), 116 Ill. 2d 323.

There the prosecutor told the jurors that "only the imposition of a sentence of death would be consistent with dignity and their personal commitment to the law, and that which is consistent with the dignity of the proper administration of the criminal justice system." (116 Ill. 2d at 349.) This court rejected the defendant's arguments that the remarks were designed to incite the jurors' passions, fears and emotions and held that the remarks were not so prejudicial as to deny the defendant a fair trial.

Another contention of the defendant is that the prosecutor at the second stage of the death penalty hearing misstated the burden of proof and improperly led the jurors to believe that the defendant had the burden of proving mitigating factors sufficient to preclude the imposition of the death penalty. Specifically, he complains of these remarks:

"A mitigating factor sufficient to preclude the imposition of the death penalty. That's the standard. There is no mitigating factor.

As you sit there, defense counsel just a moment ago said no matter how little they tried to show what he's done, they realize it's little. They haven't been able to show but a little. There's nothing that's been shown to you to preclude the imposition of the death penalty.

The defendant has been found eligible. They don't want to talk about the scales but the scales have been tipped. The scales have been tipped because the defendant is eligible for the death penalty."

We do not agree with the defendant that the remarks deprived him of a fair trial because they had the effect of arguing that the burden of proof should shift to the defendant simply by reason of his having been found eligible for the death penalty.

This court has held that the statute places on the State the burden to prove the existence of a statutory aggravating factor beyond a reasonable doubt (Ill. Rev.

Stat. 1983, ch. 38, par. 9—1(f)), and once the State establishes the existence of statutory aggravating factors, the defendant has the burden of coming forward with evidence of mitigating factors sufficient to preclude imposition of the death penalty. (*People v. Olinger* (1986), 112 Ill. 2d 324, 351; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445-46.) Sections 9—1(g) and (h) provide that, once the State has proved the existence of any of the aggravating factors beyond a reasonable doubt, a unanimous jury or the court must weigh the mitigating factors against the aggravating factors and in order to authorize the death penalty must conclude that no mitigating factors sufficiently preclude the imposition of the death sentence. See also *People v. Brownell* (1980), 79 Ill. 2d 508, 534.

In context, the prosecutor's remarks correctly informed the jury that once the State has proved a factor in aggravation, the defendant becomes subject to the death penalty and the issue then is whether there are sufficient mitigating factors to preclude imposition of the penalty. In any event, if it could be said there was error, it was cured when the jury was properly instructed as to the burden of proof. We decline to reverse on that ground. See *People v. Spreitzer* (1988), 123 Ill. 2d 1.

The defendant also argues that it was error for the court and the prosecutor to state to the jurors that they are not to consider sympathy for the defendant as a mitigating factor. The record shows that during jury selection prospective jurors were told by the prosecutor that they should not consider sympathy and this was repeated in closing argument at sentencing. The jury was also instructed by the court that "[n]either sympathy nor prejudice should guide you."

The defendant did not object in the trial court so as to preserve this question for appeal. (*People v. Walker* (1985), 109 Ill. 2d 484, 504.) This appears to have been

done as a matter of strategy by trial counsel. In any event, his contention is not persuasive. In *People v. Stewart* (1984), 104 Ill. 2d 463, 493-94, this court upheld an instruction to a sentencing jury that "neither sympathy nor prejudice should influence you" in determining whether the death penalty is to be imposed. The proposition that sympathy is not a factor to be considered in a death penalty hearing was restated in *People v. Olinger* (1986), 112 Ill. 2d 324, 351. Here trial counsel for the defendant agreed with the prosecutor and told the jurors that they should not sympathize with either the defendant or the victim or members of his family. The defendant under these circumstances can hardly complain.

The next complaint of the defendant is the prosecution's argument that the death penalty was appropriate here to protect society from the defendant. At stage two of the sentencing proceeding, the prosecutor reminded the jury that the defendant was on an appeal bond from a Maryland prison term at the time he committed the offenses here. In response, defense counsel argued that being on appeal bond was not an aggravating factor and that "him being free to get out on the street before or hereafter is not your determination." Later, defense counsel told the jurors that they should not "concern yourself with is he going to get five years or natural life without parole or will he be paroled within twenty years." The court thereafter sustained the prosecutor's objection to defense counsel's comments. In rebuttal, the prosecutor stated:

> "The death penalty, ladies and gentlemen of the jury, the death penalty is society's way—it's society's way of protecting itself from the likes of Ron Barrow. Ron Barrow is not fit to be around human beings. He whips on them and he kills them."

The court sustained defense counsel's objection to the remarks, and the prosecutor continued:

"Use your common sense, your everyday experiences in life, as the Judge will tell you in making your decision. Society looks to the jury system. Society counts on the jury system because that's the way, ladies and gentlemen, we, as society, protect ourselves. We, as a society, protect ourselves from killers. He planned the murder. He planned it for a week. He did it to eliminate witnesses. He shows no remorse. He will commit other crimes. You heard it on the tape. There's money out there. He will kill again because without witnesses, you can't do nothing."

The defendant claims that the remarks require the vacation of the death penalty and a new sentencing hearing.

This court has held that evidence is not proper at the sentencing hearing if it does not bear on the aggravating or mitigating factors, the circumstances of the offense or the character or rehabilitative potential of the particular defendant. (*People v. Holman* (1984), 103 Ill. 2d 133, 163; *People v. Szabo* (1983), 94 Ill. 2d 327, 366-67.) The court, relatively, has held that comment on the possibility of the defendant's obtaining parole, to implicitly persuade the jury to impose the death penalty, is improper and prejudicial. (*People v. Lyles* (1985), 106 Ill. 2d 373, 410; *People v. Brisbon* (1985), 106 Ill. 2d 342, 365-68.) This court has distinguished prosecutorial argument which generally explains the deterrence rationale behind the death penalty from prejudicial remarks directed at the particular defendant, and concluded only the latter type of argument was improper. See *People v. Lego* (1987), 116 Ill. 2d 323, 349; *People v. Holman* (1984), 103 Ill. 2d 133, 170.

The prosecutor's remarks here cannot reasonably be construed as simply commenting generally on the deterrent effect of the death penalty. The prosecutor explicitly told the jurors that they should impose the death penalty

because if they did not the defendant would be committing other crimes.

Although the remarks were improper, upon a review of all of the evidence and circumstances in the record, we deem that the jury's attention was not diverted from its consideration of the circumstances of the offense and the nature and character of the defendant. (*People v. Hall* (1986), 114 Ill. 2d 376, 419.) The comments were isolated and not dwelt upon. Moreover, the jury was instructed on the purpose of closing argument and to disregard statements made in closing argument that were not based on the evidence. We are not persuaded that the challenged conduct requires reversal of the conviction.

There was also error, the defendant says, when the prosecutor told the jury that the defendant should be given the death penalty because he showed no remorse for his crimes.

In determining the appropriate sentence, the trial judge is to consider all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding. (*United States v. Grayson* (1978), 438 U.S. 41, 48, 57 L. Ed. 2d 582, 588, 98 S. Ct. 2610, 2614; *People v. Ward* (1986), 113 Ill. 2d 516, 528.) This court has consistently held that a convicted defendant's remorse or the absence of it is a proper subject for consideration at sentencing. (*People v. Albanese* (1984), 102 Ill. 2d 54, 80-81; *People v. Morgan* (1974), 59 Ill. 2d 276, 282.) It was not improper for the judge to evaluate and consider the defendant's lack of remorse in light of the other relevant facts. Absent an abuse of this discretion, which was not shown from this record, the trial court's sentence should not be disturbed. *People v. Perruquet* (1977), 68 Ill. 2d 149, 154.

The defendant also claims that evidence was erroneously admitted in aggravation at the second phase of the

sentencing hearing. Specifically, he complains of several exhibits entered into evidence which were copies of cartoons, apparently from a magazine, on which the defendant made various drawings and writings. For the most part, the drawings and comments expressed derogatory references to prosecution witnesses Harold Wrona and a Delaware police officer who investigated an armed robbery of which the defendant was convicted. Another exhibit was a drawing by the defendant of a man resembling the defendant with a rat labeled "Smokie," a bomb with a burning fuse, a man labeled "Illinois" and some obscene words.

In *People v. Free* (1983), 94 Ill. 2d 378, 422, this court described the standard for admissibility of evidence at a death penalty proceeding:

> "Our statute clearly provides that the only finding necessary in determining the admissibility of evidence at the aggravation/mitigation phase is that the evidence be relevant. The rules of evidence, as provided in section 9—1(e), are suspended at this stage, so that the judge or jury, as the sentencing authority, may have all relevant evidence before it. In this phase of the sentencing hearing, the State and defendant are allowed considerable leeway in the presentation of relevant evidence as long as the evidence is also reliable."

As a general proposition, any evidence regarding the defendant's character is relevant and admissible. *People v. Salazar* (1988), 126 Ill. 2d 424; *People v. Stewart* (1984), 104 Ill. 2d 463, 492.

Considering these standards it cannot be said that the trial court abused its discretion in admitting this relevant and reliable evidence. If nothing more, the exhibits show that the defendant had no remorse for his crimes. As stated, this is a proper consideration at sentencing. *People v. Albanese* (1984), 102 Ill. 2d 54, 80-81; *People v. Morgan* (1974), 59 Ill. 2d 276, 282.

The defendant also complains of testimony in aggravation that the defendant was seen with a box containing "white powder" in his possession. We agree with the defendant that this testimony, apparently to suggest possession of drugs, was unreliable as evidence and failed to meet the standard for accuracy of information to be considered by a sentencing jury. (*People v. Devin* (1982), 93 Ill. 2d 326.) Given the strong evidence in aggravation and the slight mitigation, however, we cannot say that this isolated testimony so prejudiced the defendant as to deny a fair sentencing hearing.

The defendant also challenges his sentence of death as inappropriate and excessive in light of his character and personal background. He asks the sentence be vacated and the cause remanded for the imposition of a sentence of imprisonment.

The eighth amendment requires "consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991; *People v. Free* (1983), 94 Ill. 2d 378, 428.) When reviewing a sentence of death, this court will make an independent evaluation of the record but will not overturn a trial court's findings when amply supported by the evidence. *People v. Odle* (1988), 128 Ill. 2d 111, 130; *People v. Brownell* (1980), 79 Ill. 2d 508, 539-40.

Here there is clear evidence of careful planning in the defendant's actions. The evidence also showed that the defendant boasted of the murder and showed little, if any, remorse. The record shows the defendant's convictions of armed robbery, larceny and unlawful use of a handgun in a felony. We cannot say, considering the

nature of the crime and the character of the defendant, that the death penalty was unwarranted.

The defendant also makes a number of challenges to the constitutionality of our death penalty statute. The defendant recognizes, however, that these arguments have been rejected and finds no ground for reconsidering those determinations. This court has rejected the argument that the sentencing provision unconstitutionally places on the defendant the burden of persuasion on the question whether sufficient mitigating circumstances exist to preclude imposition of the death penalty. (*People v. Whitehead* (1987), 116 Ill. 2d 425, 465; *People v. Caballero* (1984), 102 Ill. 2d 23, 49.) This court has also rejected claims of unconstitutionality on the following grounds: that the statute provides inadequate pretrial notice of aggravating evidence (*People v. Albanese* (1984), 104 Ill. 2d 504, 540-41); that the sentencing body is not required to provide a written statement of its findings (*People v. Gaines* (1981), 88 Ill. 2d 342, 383-84); and that the sentencer is not required to make a specific finding after weighing aggravating and mitigating factors that a death sentence will be appropriate punishment (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445-46). It has been held too that the statute is not constitutionally infirm because it does not provide a procedure whereby a sentence of death is reviewed to ascertain whether or not it is proportional to the death penalty ordered in resembling situations. *People v. Walker* (1985), 109 Ill. 2d 484, 508.

This court has held that the contention that the death penalty statute arbitrarily imposes the death penalty is totally without merit. (*People v. Guest* (1986), 115 Ill. 2d 72, 111.) This court has also previously considered and rejected claims that the discretion statutorily vested in a State's Attorney to seek the death penalty results in the arbitrary and capricious imposition of the death penalty.

(*People v. Brisbon* (1985), 106 Ill. 2d 342, 362; *People v. Owens* (1984), 102 Ill. 2d 145, 160.) We would observe that this court in *People v. Terrell* (1989), 132 Ill. 2d 178, 227-28, remarked:

"We are aware, of course, that a United States District Court judge in the Central District of Illinois held our death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) unconstitutional on the grounds that it gives the prosecutor too broad a discretion whether to ask for the death penalty and lacks adequate notice provisions as to when the death penalty would be sought (*United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246), claims this court has consistently rejected (see *People v. Silagy* (1984), 101 Ill. 2d 147, 161-62; *People v. Gaines* (1982), 88 Ill. 2d 342, 369). This court in *People v. Del Vecchio* (1989), 129 Ill. 2d 265, commented on this holding:

'We are aware of the opinion of the United States District Court for the Central District of Illinois, filed April 29, 1989, in the case of the *United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246. In that case the court held the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) unconstitutional. In passing on Federal constitutional questions, State courts and lower Federal courts have the same responsibility and occupy the same position. Until the Supreme Court of the United States has spoken, State courts are not precluded from exercising their own judgments on Federal constitutional questions. Because lower Federal courts exercise no appellate jurisdiction over State courts, decisions of lower Federal courts are not conclusive on State courts, except insofar as the decision of the lower Federal court may become the law of the case. *United States ex rel. Lawrence v. Woods* (7th Cir. 1970), 432 F. 2d 1072; see also *City of Chicago v. Groffman* (1977), 68 Ill. 2d 112; *People v. Stansberry* (1971), 47 Ill. 2d 541.' *Del Vecchio*, 129 Ill. 2d at 295-96."

For the reasons stated, the judgment of the circuit court of La Salle County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, March 20, 1990, as the date on which the sentence entered in the circuit court of La Salle County is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). A certified copy of the mandate of this court shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

RYAN and CALVO, JJ., took no part in the consideration or decision of this case.