NOTICE

Decision filed 10/14/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 200038-U

NO. 5-20-0038

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 17-CF-74 |
| | ) | |
| LESTER JONES, | ) | Honorable |
| | ) | Zina R. Cruse, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice Boie and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1     *Held*: The defendant was not denied his right to a full and fair direct appeal of his trial proceedings where the record was sufficient. The defendant was not denied a fair trial where no error was shown regarding the State's line of questions in *voir dire*.

¶ 2     The defendant, Lester Jones, appeals his conviction of first degree murder after a jury trial. The defendant asks this court to reverse his conviction outright and order the dismissal of the charges against him claiming that the record on appeal is incomplete and the State asked improper *voir dire* questions. For the following reasons, we affirm the judgment of conviction.

1

¶ 3                          I. BACKGROUND

¶ 4     On January 21, 2017, Mario King was shot in the head with a firearm. The defendant was arrested that same day and charged with first degree murder in violation of section 9-1(a)(1) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1) (West 2016)). On January 23, 2017, the trial court appointed a public defender and set the defendant's bond at $1 million. A grand jury subsequently indicted the defendant on first degree murder and the defendant pled not guilty. His bond remained the same.

¶ 5     The first status conference was held on March 9, 2017. The trial court entered an order on a "Pre-trial/Status/Case Management Order" form. The form order contained boxes to check regarding whether the defendant appeared "by counsel" or "with counsel." The form order also had a "status" section with boxes to check regarding whether an offer had been made, discovery had been tendered, and whether the parties were in negotiations. The form included an option for "Other," with space to write-in information on the order. Additionally, the form order contained the statement, "Unless otherwise indicated above in 'Other' — 'speedy trial' tolled by agreed continuance." The form order also had a section where the order was entered "By agreement/without objection" or "Over objection by _____." The bottom of the form order contained a scheduling section for the pretrial hearing, trial, or other court hearings.

¶ 6     The trial court used the form order at the first status conference held on March 9, 2017. The status conference order contained a handwritten statement indicating that the "speedy trial time tolled." The order also indicated that the case was continued by

agreement of the parties without objection. The defendant was present for the court appearance, and he signed the order along with his attorneys.

¶ 7     The form status conference orders were used throughout the case. Several orders were entered between March 9, 2017, and June 20, 2019. The status conferences were held without a court reporter. The trial court never entered a form status conference order which contained language that the defendant had made an affirmative statement requesting a speedy trial. The trial court never entered a form status conference order where the order was entered "Over objection." The status conference orders were entered "By agreement/without objection" unless the next court date was already determined, and remained the same. When this occurred, the court would leave the box "By agreement/without objection" unchecked. Multiple orders had handwritten notations stating, "speedy trial time tolled." Each status conference order was signed by the attorneys. The defendant would sign the orders when he was present in court.

¶ 8     During the November 9, 2017, status conference, the trial was set for February 26, 2018. On February 2, 2018, the case was continued for "additional lab work to be completed." During the May 3, 2018, status conference, the court set a new trial date of October 22, 2018. Orders entered through September 5, 2018, indicated that the State and defense were in negotiations.

¶ 9     On October 12, 2018, the State argued that the forensic pathologist was unavailable for trial on October 22, 2018. The record does not contain a transcript of this court hearing. On this occasion, the court did not use the form status conference order. The court entered a handwritten order granting the State's motion for continuance over the defendant's

3

objection. The order stated, "speedy trial time tolled." The trial was rescheduled for November 26, 2018.

¶ 10    On October 26, 2018, the court issued an order continuing the pretrial hearing date to November 19, 2018. The order did not address the trial date. The order stated that if either party was unavailable on the court date, they should contact the other party and the court clerk to reschedule a court date that was mutually agreeable.

¶ 11    The State filed a motion to continue on October 30, 2018. The State argued that the crime scene investigator, Mike Hentze, had been on medical leave and it was unlikely he would be able to return to work by the November 26, 2018, trial date. The State argued that the defendant had not made a speedy trial demand and that continuing the trial would not result in undue prejudice to the defendant.

¶ 12    On November 19, 2018, the status conference form order cancelled the November 26, 2018, trial date. The language "speedy trial tolled by agreed continuance" on the form was circled. The trial was set for January 28, 2019, with a pretrial date of January 14, 2019.

¶ 13    On January 14, 2019, another status conference order was entered cancelling the January 28, 2019, trial date by agreement of the parties without objection. The trial was reset to April 22, 2019.

¶ 14    The defendant filed a *pro se* motion for speedy trial on February 26, 2019. The defendant requested a speedy trial and stated, "I object to any delays or tolling of the speedy trial time."

4

¶ 15   On April 4, 2019, defense counsel filed a motion to suppress evidence and quash arrest. The defense argued that East St. Louis police officers had performed an illegal search which led to the improper arrest of the defendant and the seizure of evidence.

¶ 16   The defendant filed a *pro se* petition for discharge on April 15, 2019, based on a speedy trial violation. The defendant stated in his motion that he had been in custody since January 21, 2017. He argued that more than 120 days from the date he was taken into custody had lapsed and his right to a speedy trial had been violated. The defendant claimed that he repeatedly informed his public defender and the court of his right to a speedy trial. He also argued that he did not cause any delay, and his public defender agreed to toll the speedy trial timeline without the defendant's consent. The defendant further argued that he objected multiple times to the State's motion to continue and filed a petition to preserve his objection after he became aware that his attorney agreed to toll the timeline.

¶ 17   On April 29, 2019, a handwritten order was entered which reset the defendant's motion to suppress to allow the defense to subpoena a witness. The order included that the "speedy trial time remained tolled pending resolution of the motion to suppress."

¶ 18   The defendant's motion to suppress was scheduled for May 9, 2019. The defendant's witness had not been subpoenaed, and the motion was continued. The court addressed the defendant's speedy trial claim and found that 48 days had run against the speedy trial demand.

¶ 19   On May 16, 2019, the court assigned new counsel, Cathy MacElroy, to represent the defendant. The handwritten order entered stated that the speedy trial time tolled against the defense.

5

¶ 20   The next day, on May 17, 2019, the defendant wrote a letter to the court. The defendant informed the court that he had repeatedly asked his appointed attorney to proceed with trial, but his attorney had wanted him to take a plea deal. The defendant stated that he had met with his attorney on October 8, 2018, and informed his counsel that he wanted to go to trial. The defendant claimed that his attorney continued to agree to toll his speedy trial time. The defendant alleged he was not present in court when the delays were made and was not given an opportunity to object. The defendant explained, "I sent my own speedy trial motion on 2-26-2019 reinvoking my rights that my 120 would have started back up on 4-4-2019, but since my counsel filed a motion, it was tolled until we heard the motion." The defendant additionally claimed that he "already know they is not going to file this like they didn't file none of my other letters. They are going to say they never received any from me so the things they doing won't be on the record." The defendant attached copies of three additional letters to his correspondence with the court.

¶ 21   One of the letters was addressed to Thomas Philo, defense counsel, dated November 11, 2018. In the letter to Philo, the defendant stated that he was not being adequately represented. He referred to a letter where he previously requested that he receive a speedy trial. The defendant stated that, "I don't think it would be a wise move for me to go to trial two weeks from now with you on my case" and he had requested a different attorney. He additionally requested that his attorney "find out what all evidence that they do have against me so I can know just in case I have to go ahead and represent myself." The defendant then went on to discuss issues with witness statements and the evidence in the case.

¶ 22   The defendant also attached a letter dated April 7, 2019, addressed "to whom it may concern." In that letter, the defendant described a conversation with his attorneys about the violation of his right to a speedy trial. The defendant was informed that he did not understand the statute and his rights had not been violated. One of the defendant's attorneys explained to the defendant that they did not proceed with a speedy trial because they were doing what was best for the defendant. The defendant stated, "I found out in October 2018 my rights to my 120 had been tolled I wrote [defense counsel] telling him I didn't agree to any tolling or delays that I wanted to go to trial that's when he told me he wasn't ready or prepared even though he has had this case for over a year." When the defendant confronted his attorney about why he did not respect his wishes and demand a speedy trial, his attorney responded that he wanted the defendant to take the plea deal.

¶ 23   The third letter was dated April 25, 2019, and addressed to Cathy MacElroy, the attorney most recently appointed to represent the defendant. In this letter, the defendant explained that he had been invoking his right to a speedy trial, but no one would listen to him. The defendant requested that his attorney contact him to discuss his case.

¶ 24   On May 20, 2019, the trial court entered an order resetting the trial date due to the unavailability of the forensic pathologist. The trial date of August 5, 2019, was rescheduled to an earlier date of July 22, 2019. The order stated that the speedy trial time remained tolled.

¶ 25   The three-day jury trial began on July 22, 2019. During the *voir dire*, the State asked the potential jurors if they understood that proof beyond a reasonable doubt was different from proof beyond all doubt. All of the potential jurors raised their hands indicating that

7

they understood. The State then explained to the jurors that they would not receive a definition for "proof beyond a reasonable doubt." The State asked the jurors whether they would have difficulty determining whether the State had met its burden of proof without a definition. Two jurors acknowledged that they would have a difficult time determining whether the State had met its burden without a definition. The State responded to both, "that's perfectly acceptable" and moved on to the next topic.

¶ 26    The State also questioned the jury on whether they watched crime shows on television, and specifically named the "CSI" television series. All of the potential jurors indicated that they were familiar with the television series. The State then explained that the selected jurors should not expect to watch a scripted drama and what they have seen on television was not real. All of the jurors agreed that the television show did not imitate real life. Two members of the jury panel then asked additional questions about defining reasonable doubt. In response, the State explained that the pattern jury instructions were not created by the State, the defense attorney, or the judge. The State indicated that the jury instructions did not contain a specific definition of proof beyond a reasonable doubt. The court then explained that the jury would be provided with a set of instructions when they deliberated to guide their thought process.

¶ 27    At the conclusion of the State's questioning, the defense began its inquiry. The defense stated to the jury venire that there was a difference between the burden of proof in a civil case and a criminal case. Beyond a reasonable doubt was a higher standard than the preponderance of the evidence standard, which meant "more likely than not." The defense stated that proof beyond a reasonable doubt means that, "we're not starting in the middle,

going one way or another. We're starting at zero and the State's Attorneys, they have to prove to you beyond a reasonable doubt that [the defendant] is guilty of what they've alleged."

¶ 28    The defense also differentiated between television and an actual jury trial. The defense explained to the jury venire that there would not be an "aha" moment like in the movie the "Sixth Sense," where everything comes together at the end. Rather, each witness would tell a piece of the story and it may not be in chronological order. The defense questioned the jury members about whether they would be able to keep an open mind throughout the entire trial and not form an opinion until deliberation. At the conclusion of all of the questioning, the members of the jury were chosen.

¶ 29    After the jury was selected and opening statements were made, the State called Officer Leland Cherry, with the East St. Louis Police Department. Cherry testified that on January 21, 2017, he was dispatched to Patricia Washington's apartment and arrived at 4:51 a.m. Three other police officers arrived around the same. Patina Washington, the person who had called the police, approached Cherry outside when he arrived at the apartment complex. Washington allowed Cherry to enter the apartment, where he discovered a body "hunched over" the right side of a chair in the living room. At first, he did not notice any injuries, but saw a pool of blood under the body and blood spatter on the right side of the chair. Cherry then called for an ambulance, and he determined that the body was that of Mario King. Cherry did not collect any evidence from the crime scene, and he took Washington to the police department for questioning. Other officers remained at the apartment to secure the crime scene and collect evidence.

¶ 30 Patina Washington then testified that she lived in a John Deshields public housing apartment with her daughter. On January 20, 2017, Washington arrived home sometime between 10:30 p.m. and 10:45 p.m., after work. When she arrived home, Deaires Cox, Washington's friend, and the defendant were in her apartment playing cards and dominos. Mario King arrived later. The three men were drinking beer and liquor. Washington was cleaning up her apartment and not paying much attention to her guests' conversation, although she heard the defendant confront King for having mud on his boots. Washington testified that she also heard King accuse the defendant of being a snitch and being homosexual. After 3 a.m. Washington went to bed while the television remained on. Then, the sound of a gunshot woke her up. At first, the apartment was silent. Then, Washington heard Cox say, "man, you trippin." She heard her front door slam close twice. Washington testified that she believed King was still in her apartment because she had told him that he could stay with her that night. Washington called out for King three times. She walked down her hallway and found King in her living room. King had "blood leaking from his head" and Washington knew that King was dead. She then panicked. After she was able to calm herself down, Washington left her apartment, got into her car, and drove to the front of her apartment. Cox called her. Cox told Washington that he was afraid for his life and that she should call the police. Washington then called the police, and they arrived minutes later. Washington met them outside and showed them her apartment. Cox returned to the apartment after the police had arrived. Washington and Cox were taken to the police station for an interview. When Washington returned home, she saw the

defendant's jacket in her apartment. A police officer at the crime scene collected the jacket as evidence.

¶ 31 Deaires Cox testified that he had known King since 1996 and they both grew up in the John Deshields apartment complex. Cox testified that he was smoking marijuana, drinking, and watching television at Washington's apartment on the evening of January 20, 2017. The defendant was with Cox that evening. King arrived later, intoxicated. King tracked mud into the apartment, which upset the defendant. Washington had brought six pieces of fish home with her from work and King ate two pieces. This also upset the defendant because Cox and the defendant only had one piece. King had also insulted the defendant by calling him "Leslie," implying that the defendant was homosexual.

¶ 32 During the trial, Cox identified a photograph of a revolver and testified that he saw the defendant with the gun on the evening of January 20, 2017. After Washington went to her bedroom, Cox heard the defendant cock his gun. Cox asked the defendant, "what's up, man?" Then, the defendant de-cocked the gun. Cox testified that he believed the defendant was going to kill them. At that time, King was "going in a stumble, like sleeping." The defendant then stood up. He was standing four or five feet away from King. With his arm extended, the gun was about two feet from King's head. The defendant shot King in the face. According to Cox, after the defendant shot King, the defendant stood there and said that he "f*** up."

¶ 33 Cox testified that he was afraid that the defendant was going to shoot him and Washington because the defendant had said that he "did not want any co-defendants." Cox calmed the defendant down by talking to him and promising to clean everything up. Cox

11

then walked with the defendant to Jamica Walton's apartment. Walton also lived in the Deshields apartment complex. During the walk, the defendant put his gun to his own head and Cox talked him out of pulling the trigger. When they arrived at Walton's, Cox did not explain anything to Walton. Cox helped the defendant to Jamica's bedroom and then left. Cox ran to another friend's apartment in the Deshields apartment complex and called Washington. Cox told Washington to call the police. After Cox heard sirens, he returned to the crime scene to tell the police officers where the defendant was located. Cox was then interviewed at the police station.

¶ 34 Later that morning, after Cox and Washington were interviewed, they returned to Washington's apartment. Cox noticed the defendant's jacket and informed a police officer. Cox identified the jacket at trial, and it was admitted into evidence.

¶ 35 David Wargo, a special agent with the Illinois State Police, also testified. Surveillance videos were shown. Wargo testified that from 4:27 until 4:29 a.m., two people exited apartment 1-C and walked towards Building 11. Then, at 4:32 a.m. the surveillance video showed a person running from Building 11 down Bond Avenue. From 4:56 a.m. until 5 a.m., a light-colored car, believed to be Washington's, drove down Bond Avenue and stopped across from apartment 1-C. Police cars then arrived, and the person driving the car emerged and approached the police officers in the back of the apartment.

¶ 36 Jamica Walton testified that she lived in Building 11 in the John Deshields apartment complex. The defendant would occasionally stay with Walton. Walton did not know Cox or Washington. On January 20, 2017, the defendant was at Walton's apartment at 2 p.m., along with other guests. They had been smoking marijuana and drinking all

12

afternoon. Walton went to sleep around 10 p.m. and the defendant left with the other guests. Later that night, the defendant returned with Cox. The defendant had a cocked gun in his hand when he arrived, and he repeatedly asked Walton if she loved him. Walton said she loved him because the defendant was holding a cocked gun. Walton went to her upstairs bedroom and Cox and the defendant followed. Walton used her bed cover to take the cocked gun from the defendant without getting her fingerprints on the gun. After Walton took the gun from the defendant, Cox left the apartment. The defendant then walked out of Walton's room and walked towards the living room downstairs. Walton testified that the defendant was intoxicated and fell down the stairs. Shortly thereafter, the East St. Louis Police Department arrived. The defendant was asleep on the couch in the living room.

¶ 37 Walton testified that she told the police that the defendant had fallen asleep on the couch earlier that evening when she went to bed. She also told the police that she did not know whether the defendant had left her apartment that evening. At trial, Walton admitted that she was dishonest when she spoke to the police because she was afraid of being evicted from public housing for possessing a gun. The defendant was then arrested, and Walton allowed the police to search her apartment. The police found the gun on Walton's television stand in her bedroom where she had placed the gun earlier.

¶ 38 Richard Sharp, a police officer with the City of East St. Louis, testified next. Sharp arrived at the Deshields apartment complex at 4:55 a.m. Sharp received information regarding where the defendant could be located. Sharp, along with three other police officers, apprehended the defendant at Walton's apartment. When Sharp arrived, the defendant was asleep on the couch and a pair of Nikes were on the floor next to him. Sharp

13

noticed blood on the defendant's shoes. The defendant was arrested and handcuffed with his hands behind his back.

¶ 39    Denis Janis, with the Illinois State Police, testified that he administered a gunshot residue test on the defendant at the police station after the defendant had been handcuffed. The test collects "gunshot residue or primer particles off someone who has been—who has fired a firearm or—and close to someone who's fired a firearm." Janis was not able to determine whether the defendant had washed his hands prior to the collection of a sample.

¶ 40    Mary Wong, with the Illinois State Police, testified about the results of the gunshot residue test. The test did not detect gunshot residue on the defendant. Wong testified that, "any type of movement of the hands will cause an exponential loss of these particles, so the more you move your hands, the quicker that these particles will fall off, and washing of the hands is highly effective in removing it." Rubbing hands together or wiping hands on clothing can remove primer gunshot residue. Wong agreed that it would be possible for a person to have fired a gun and not have primer gunshot residue on his hands during testing. Based upon Wong's findings, the defendant may not have discharged a firearm with either hand. If he had fired the gun, then the particles were either removed, not deposited, or not detected by the procedure.

¶ 41    The investigating officer, Michael Hentze, testified to photographs taken of the crime scene. Hentze had taken photographs of King and the inside of Washington's apartment, including photographs of footprint impressions. Hentze testified that King appeared to have died within hours of his arrival because there were no signs of rigor mortis. King's boots were collected into evidence and there was mud on the soles. Hentze

14

had also taken photographs of Walton's apartment. He collected a pair of silver, black, and blue Air Jordan shoes that appeared to have bloodstains on them. He also found a cocked Dan Weeson .357 Magnum revolver on the television stand in Walton's bedroom that had one shell casing. After leaving Walton's apartment, he returned to Washington's apartment to retrieve an orange, gray, and black coat. In the pocket of the coat was a black glove that contained 13 .357 Magnum cartridges. Hentze also collected DNA and fingerprints from the defendant.

¶ 42    Jay Winters with the Illinois State Police Forensic Lab tested a swab taken from the defendant's shoe and found a mixture of DNA that matched King along with a low level of DNA that possibly matched the defendant. Winters also tested a sample taken from the gun grip. The mixture of DNA from the gun was from at least three individuals, and the results were inconclusive.

¶ 43    Jarran Riley with the Illinois State Police had interviewed Cox and Washington. After the interview, Riley transported Cox and Washington back to the Deshields apartment complex. When they arrived, Riley testified that law enforcement was still present at the crime scene. Washington and Cox went inside of her apartment and Cox returned to Riley's car to inform him that the defendant's jacket remained inside the apartment. Riley then notified Hentze to collect the evidence.

¶ 44    Lindell Moore, with the Illinois State Police, analyzed the shoe impression found at the crime scene from a photograph. Moore was unable to determine if the defendant's shoes made the impressions found at the crime scene.

15

¶ 45    Kamal Sabharwal testified that he performed King's autopsy. King had a visible gunshot wound to his face, to the right of his eye. Sabharwal identified an abrasion ring, which indicated an entrance wound. He also testified that there was gunpowder stippling around the gunshot wound which indicated that the gun was fired at a close range. The shooter could have been within four to five feet from King. The bullet travelled through the skin of the face, into the neck, and across the first cervical vertebra, the highest bone in the neck of the spine. It went through the bone and spinal cord, cutting the spinal cord, before resting in the soft tissue of the back left side of the neck. Sabharwal determined that King had died minutes after he was shot.

¶ 46    The State rested its case after Sabharwal's testimony. The defense made a motion for directed verdict. The trial court denied the motion without argument from the State. The defendant did not testify or present further witnesses or evidence.

¶ 47    After closing arguments, the court provided jury instructions, which included that the State had the burden of proving the offense of first degree murder beyond a reasonable doubt. The jury was also given an instruction that explained the elements which must be found when determining whether the defendant was the actual person who had discharged the firearm that caused the death of King. The jury found the defendant guilty of first degree murder and found that the defendant personally discharged a firearm that proximately caused death to another person (King).

¶ 48    On August 13, 2019, the defendant filed a *pro se* motion claiming ineffective assistance of counsel. The defendant claimed that his attorneys failed to provide adequate representation where they did not challenge inconsistencies in witness testimony or

challenge expert witness testimony. The defendant did not include claims related to a speedy trial violation or issues regarding the *voir dire* examination.

¶ 49    The defendant's attorney filed a posttrial motion claiming that the State failed to prove the defendant's guilt beyond a reasonable doubt. The posttrial motion did not raise issue with a speedy trial violation or *voir dire.*

¶ 50    A *Krankel* hearing was held on September 5, 2019, to address the defendant's claim of ineffective assistance of counsel. The trial court found that there was no basis for the defendant's claim of ineffective assistance of counsel.

¶ 51    On October 31, 2019, the court heard the defendant's posttrial motion. The defense claimed that the State failed to prove material allegations beyond a reasonable doubt, including that the State failed to prove beyond a reasonable doubt that the defendant personally discharged the weapon that caused the death of King. The State argued that it proved its case beyond a reasonable doubt where multiple witnesses testified, the gun was found, and the defendant's coat contained ammunition consistent with the caliber of gun used to kill King. The defendant also had King's blood on his shoes. The trial court denied the defendant's posttrial motion and proceeded with sentencing. The defendant was sentenced to a total of 50 years in the Department of Corrections, which included a 25-year sentence enhancement for using a firearm, served at 100%, and 3 years of mandatory supervised release.

¶ 52    A motion to reconsider the sentence was filed on November 26, 2019. The defense argued that the defendant's 50-year sentence was unduly harsh and violated the eighth and

fourteenth amendments to the United States Constitution. The court denied the motion to reconsider on January 30, 2020. This appeal followed.

¶ 53                                    II. ANALYSIS

¶ 54                          A. Sufficiency of the Record

¶ 55     The defendant claims that the record is insufficient, resulting in a denial of his constitutional right to a full and fair direct appeal of his trial proceedings. We disagree.

¶ 56     The denial of a defendant's right to a direct appeal as a result of an incomplete record is reviewed *de novo*. *People v. Appelgren*, 377 Ill. App. 3d 137, 140 (2007). The appellant generally has the burden to present a sufficiently complete record to support any claims of error. *People v. Sims*, 403 Ill. App. 3d 9, 15 (2010). This rule is relaxed where the defendant was not at fault in providing an incomplete record and the defendant established a colorable need for the missing portion of the record in order to obtain appellate review. *Appelgren*, 377 Ill. App. 3d at 142-43.

¶ 57     Under Illinois Supreme Court Rule 323, "[i]f no verbatim transcript of the evidence of proceedings is obtainable the appellant may prepare a proposed report of proceedings from the best available sources, including recollection." Ill. S. Ct. R. 323(c) (eff. July 1, 2017). "The presence of a court reporter is not necessarily required in order to ensure that the record on appeal is sufficiently complete for review." *People v. Banks*, 378 Ill. App. 3d 856, 861 (2007). The defendant had the responsibility for preserving a sufficiently complete record of the proceedings before the trial court. *Banks*, 378 Ill. App. 3d at 861.

¶ 58     The record shows that the defendant was present in court with defense counsel or through his defense counsel for the status conferences. Defense counsel never requested a

18

court reporter, and the defendant did not prepare bystander reports where transcripts were not available. However, the discussions of every status conference were memorialized through the court's case management form order, entered at most of the pretrial conferences or through handwritten orders. The record also contains documents filed by the defendant.

¶ 59    According to the defendant, there is a colorable need for the missing transcripts to determine whether the defendant was denied his statutory and constitutional right to a speedy trial, his claim for ineffective assistance of counsel, or was denied the right to represent himself. We disagree.

¶ 60    The speedy trial statute provides that, "[e]very person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant ***." 725 ILCS 5/103-5(a) (West 2018). To prove a speedy trial violation, the defendant must show that he was not tried within the 120 days set by the statute and that he had not caused or contributed to the delays. *People v. Murray*, 379 Ill. App. 3d 153, 158 (2008). Delays attributable to the defendant toll the speedy-trial period until the expiration of the delay; at that time, the statute begins to run again. *Murray*, 379 Ill. App. 3d at 158.

¶ 61    Additionally, a mere objection to a delay is not sufficient to invoke the statutory speedy-trial right. *People v. Hartfield*, 2022 IL 126729, ¶ 35. The statute requires "some affirmative statement in the record requesting a *speedy* trial." (Emphasis in original and internal quotation marks omitted.) *Hartfield*, 2022 IL 126729, ¶ 35.

¶ 62    The defendant argues that a speedy trial violation may have possibly occurred where no transcripts of the status conference proceedings were available. He specifically addresses orders entered on October 12, 2018, and October 24, 2018. However, the defendant has not asserted that a specific oral demand for a speedy trial was made by him or his attorneys.

¶ 63    During the October 12, 2018, court proceeding, the State requested a continuance because the forensic pathologist was unavailable for trial. Although the order reflects an objection by the defense, the order signed by defense counsel stated that the speedy trial time was tolled. The order did not include an affirmative statement requesting a speedy trial. No further demands or clarifications were made by defense counsel. The defendant also addressed the October court appearance in his letter to the court. The defendant stated, "I found out in October 2018 my rights to my 120 had been tolled I wrote [defense counsel] telling him I didn't agree to any tolling or delays that I wanted to go to trial that's when he told me he wasn't ready or prepared even though he has had this case for over a year."

¶ 64    On October 24, 2018, the court entered an order rescheduling pretrial motions for a later date. The order instructed the parties to contact each other and the court clerk if either party was unavailable. The order itself did not modify the trial setting. The record does not include a response from the defense objecting to the rescheduled pretrial hearing or demanding a speedy trial.

¶ 65    It is clear from the trial court's orders and the defendant's letter to the court that defense counsel never made an oral request for a speedy trial during a status conference. The form order used by the trial court contains language that "[u]nless otherwise indicated

20

above in 'Other'—'speedy trial' tolled by agreed continuance." The status conference orders issued by the trial court never included language that the defendant had made an oral demand for trial under the speedy trial statute. Although the form order had space to mark when a defendant objected, none of the orders showed that the defendant objected to a continuance. The orders demonstrated that court dates were set by agreement of the parties or that section of the order was left blank when the next court date had already been scheduled.

¶ 66    One of the defendant's letters filed with the court explained a conversation that he had with his attorneys about his right to a speedy trial. His attorneys had explained the speedy trial statute to him and had explained that his right to a speedy trial was not violated. The defendant wrote in the letter that "they didn't adopt my wishes to a 120-day speedy trial because he was doing what was best for me." Defense counsel wanted the defendant to take a plea deal. The defendant did not assert that his attorneys had ever made a speedy trial demand during a status conference.

¶ 67    The record contains a written demand for trial which was filed by the defendant on February 26, 2019. The trial was subsequently continued after the written demand because the defense filed a motion to suppress evidence and quash arrest. That motion was continued for the defendant to subpoena a witness. Then, on May 16, 2019, a new attorney was appointed for the defendant, and the trial was continued. After the defendant filed a written demand for trial, the State also asked the court for a new trial date because its forensic pathologist was unavailable. The court rescheduled the trial for an earlier date to

accommodate the State's witness. The trial was held on July 22, 2019, without further delays. The defendant's right to a speedy trial was not violated.

¶ 68    The defendant also argues that counsel was ineffective for not providing a court reporter at the status conferences. To prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The record, however, is sufficient to determine that the defense did not demand a speedy trial during the status conference dates. Defense counsels' decision to proceed without a court reporter for status conferences was not ineffective assistance.

¶ 69    The defendant additionally argues that without "any record" of what occurred at the hearing dates there was no way to determine whether the defendant was possibly denied the right to represent himself. We find this argument unavailing.

¶ 70    "When a defense attorney requests a continuance on behalf of a defendant, any delay caused by that continuance will be attributed to the defendant." *People v. Mayo*, 198 Ill. 2d 530, 537 (2002). However, a defendant is not bound by his attorney's actions when he clearly and convincingly attempts to assert his right to discharge his attorney and proceed to trial. *Mayo*, 198 Ill. 2d at 537. The record shows that defense counsel requested continuances and agreed-to continuances which tolled the defendant's speedy trial time. The defendant filed several documents regarding a speedy trial claim and never indicated to the court that he wished to represent himself.

¶ 71    The defendant was not denied the right to a direct appeal where the record was sufficient to determine what occurred during the trial court proceedings. Transcripts from status conferences were not necessary where the record showed that defense counsel agreed to continuances, the defendant made a speedy trial demand on February 26, 2019, and continuances thereafter were caused by the defense.

¶ 72                                    B. *Voir Dire*

¶ 73    The defendant additionally claims that he was denied a fair trial where the State asked improper *voir dire* questions. The defendant acknowledges that this issue was forfeited because defense counsel did not object to the State's line of questioning and did not raise this issue in a posttrial motion. The defendant seeks reversal under plain error review.

¶ 74    The plain-error rule allows review of unpreserved claims of error in specific circumstances. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The plain-error rule is applied when:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Thompson*, 238 Ill. 2d at 613.

"The first step is to determine whether error occurred." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 75    "The purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose

23

minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath." *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993). "*Voir dire* cannot, however, be used as an opportunity to even slightly indoctrinate a juror." *Cloutier*, 156 Ill. 2d at 496. Broad questions are generally permissible, but specific questions tailored to the facts of the case and intended to serve as preliminary final argument are generally impermissible. *People v. Rinehart*, 2012 IL 111719, ¶ 17. The standard of review applicable to a trial court's manner and scope of *voir dire* examination is abuse of discretion. *Rinehart*, 2012 IL 111719, ¶ 16.

¶ 76 The defendant claims that the State engaged in two inappropriate lines of questioning. The State discussed proof beyond a reasonable doubt and discussed whether the potential jurors understood that television was different from reality.

¶ 77 In *People v. Barrow*, 133 Ill. 2d 226 (1989), and *People v. Edwards*, 55 Ill. 2d 25 (1973), our supreme court addressed the issue of the State commenting on reasonable doubt during *voir dire.* In *Barrow*, the State told the jurors during *voir dire* and closing argument that they do not need to prove guilt "beyond all doubt" or "beyond a shadow of a doubt." *Barrow*, 133 Ill. 2d at 265. In *Edwards*, the State told the jury that reasonable doubt is determined by the standard of "reasonableness," which is not the same as "beyond any doubt," or "beyond any possible doubt." *Edwards*, 55 Ill. 2d at 35. In *Barrow*, the court followed the *Edwards* reasoning that while "it would have been better practice not to attempt to define the term 'reasonable doubt' either in *voir dire* or closing argument, no error resulted which requires reversal." *Barrow*, 133 Ill. 2d at 265.

24

¶ 78    In this case, the State commented that "proof beyond a reasonable doubt" is not "proof beyond all doubt." As in *Barrow* and *Edwards*, we find that no error occurred. The jury in this case was properly instructed on reasonable doubt and we must presume that the jurors followed the court's instructions. *People v. Bell*, 113 Ill. App. 3d 588, 601 (1983).

¶ 79    The State additionally mentioned the "CSI series" on television and informed the jury panel that they would not be viewing a "scripted drama firmed in Hollywood." The State then asked the jury panel whether they understood that television "does not always perfectly imitate real life." We note that during *voir dire* the defense asked a similar line of questions. The defense stated, "our forensics aren't like they are on TV. It's not magical. You can't just snap your finger and get a result." The defense additionally mentioned suspense movies to discuss that the case may not be presented in chronological order. The State's questions were broad, and the State did not ask any questions tailored to the facts of the case. The defendant has not shown clear and obvious error.

¶ 80    Where a defendant fails to establish plain error, "the procedural default must be honored." (Internal quotation marks omitted.) *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). Therefore, we find that no error occurred, and a plain error analysis is unnecessary.

¶ 81                                    III. CONCLUSION

¶ 82    Based on the foregoing, the judgment of the St. Clair County trial court is affirmed.


¶ 83    Affirmed.

25