2025 IL App (2d) 240339-U
No. 2-24-0339
Order filed March 26, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 24-DV-39 |
| TERRENCE D. DAVIS, | ) ) ) | Honorable Ruth H. Lofthouse, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Birkett and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Sufficient evidence supported defendant's conviction of domestic battery. The court properly rejected the victim's trial testimony affirming defendant's innocence and relied instead on the incriminating statements she gave at the scene, her injuries, and defendant's phone calls from jail attempting to influence the victim's account.

¶ 2    Defendant, Terrence D. Davis, appeals his conviction of domestic battery, contending that the evidence was insufficient to prove him guilty beyond a reasonable doubt. Because the evidence was sufficient, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4      The State charged defendant with two counts of domestic battery for "grabb[ing] Keisha Malec about the body," causing her bodily harm (720 ILCS 5/12-3.2(a)(1) (West 2022)) and making physical contact of an insulting or provoking nature (720 ILCS 5/12-3.2(a)(2) (West 2022)).

¶ 5      The following facts were developed at defendant's bench trial.  Deputy Brandon Eng of the Lake County Sheriff's Office testified for the State.  During his testimony, the State periodically played portions of video recorded at the scene by Eng's body camera.

¶ 6      Eng testified that, on January 28, 2024, he responded to a home in Gurnee per a 911 request for an "[a]ssist rescue."  Before Eng's arrival, the 911 dispatcher advised him and the other responding officers that the victim was in the home's bathroom and was afraid to come out.  Eng met with the reported victim, Malec, in the front hallway.  Malec had a severe laceration on her right hand near the thumb.  Eng and Malec entered the kitchen to discuss what happened.

¶ 7      After seeing defendant walk down the stairway from the second floor, Eng followed defendant upstairs "to the bedroom where the injury occurred."  Eng saw a trail of blood from the bed into the bathroom.  He also saw broken glass near the bed.  "On the wall near the broken glass was a red liquid *** which was a splatter."  The splatter was inconsistent with someone having "thrown [a] glass at the wall," because in that case "[t]here would be a large amount of [the liquid] in one spot where impact was made not just little bits everywhere which is what [Eng] saw."

¶ 8      A portion of Eng's body camera video was played.  The video showed Eng following defendant upstairs and into a bedroom.  When Eng asked defendant what had happened, defendant answered that he had been sleeping and did not know what had happened.  Defendant added that he was sleeping when Malec got out of bed to go to the bathroom "or something."  Defendant said he thought that Malec was "being a little dramatic."

¶ 9    Eng testified that, after speaking with defendant in the bedroom, Eng returned to the kitchen. Malec was seated at the kitchen table, crying and distraught. She was holding her right hand in a towel to stop the bleeding. Eng observed red marks on Malec's neck that appeared consistent with fingers having been around her neck. When Eng asked Malec about the marks on her neck, she responded by placing her hands toward her neck. Eng asked her how she received the injuries to her hand and neck. She replied that defendant grabbed her by the neck; her hand was cut when she picked up a glass of red Kool-Aid and struck him with it. Eng identified photographs he took of Malec's neck at the scene.

¶ 10    Eng further testified that, from "work[ing] the midnight shift," he had "experience with people who might be intoxicated or under drugs or other substances that are not alcohol[.]" Based on that experience, Eng opined that Malec did not appear to be under the influence of any substance. Eng explained that Malec gave "very detailed" and consistent accounts of the incident, her pupils were not dilated, and her speech was not mumbled or slurred.

¶ 11    A portion of Eng's body camera video showed Eng talking with Malec while she sat at the kitchen table. Malec was sobbing. Malec told Eng that she had picked up a glass and hit defendant with it. Malec explained that she had gotten out of bed to get a drink and use the bathroom and that this angered defendant. Malec demonstrated by grabbing her neck with her hand. She then mentioned that there was a glass of Kool-Aid next to the bed, and she demonstrated to Eng how she swung the glass with her right arm. Eng asked, "He grabbed you by the neck?" Malec appeared to nod in reply. After some further interchange, Malec said it was difficult for her to tell what happened that night with defendant present. Eng urged her to tell him what happened and asked where defendant grabbed her. She again grabbed her neck with her hand. Eng asked if defendant choked her; Malec did not appear to reply. Eng illuminated Malec's neck with a

flashlight, commented that he saw marks, and photographed her neck. Paramedics arrived and began treating Malec. Defendant then entered the kitchen.

¶ 12 Eng testified that, after speaking with Malec, he addressed defendant, who was in the kitchen putting on his coat. Defendant said he needed to go to the hospital to be with Malec. Defendant "didn't appear [that] he wanted to speak to [Eng] about what had occurred." Eng recalled that, when he first met defendant in the house and asked what had happened, defendant "stated he didn't know. He was sleeping, he woke up and her hand was cut." Later, after Eng told defendant that he was investigating possible domestic violence, defendant said that he had grabbed Malec to restrain her because she was having an anxiety attack. He said that she might have been taking sleeping pills. Eng observed cuts on the back of defendant's hand and asked how he received them. Defendant answered that he was cut while picking up the broken glass in the bedroom. Eng told defendant that it was unlikely that he was injured on the back of his hand while picking up broken glass. Eng opined that defendant's and Malec's injuries were consistent with Malec's account that defendant grabbed her by the neck and she struck him with a glass.

¶ 13 A portion of Eng's body camera video showed Eng asking defendant in the kitchen what had happened. Defendant told Eng that he had been asleep and awoke to Malec screaming. Defendant "thought it was not as bad as what it was." Defendant commented that Malec "may be a little hysterical." Defendant denied that he and Malec had a "domestic incident." Defendant said that he told Malec to lie back down because it was still early. He thought she was being a "drama queen"; he did not know she was cut. Eng asked defendant if he was injured, and defendant pointed to the back of his right hand. Defendant told Eng that he was injured while picking up some of the broken glass. Eng told defendant that his explanation did not make sense and was inconsistent with what Malec had said. When Eng asked defendant about the blood on his neck,

defendant said that Malec had been hysterical and that he was injured while trying to calm her down. When Eng commented that defendant's injuries looked like he and Malec had been fighting, defendant denied that there had been a fight.

¶ 14 Eng testified to a second conversation he had with Malec while she was in the ambulance awaiting transport to the hospital. Malec was calmer but still crying. Malec told Eng that she had been asleep, awoke, and went to get water from the bathroom. Defendant, upset that she had gotten up, lunged across the bed and grabbed her by the throat. She responded by grabbing the glass of Kool-Aid and striking defendant with it. The glass broke and cut her. When Eng asked Malec if she had taken any medication that evening, Malec said that she had taken one Ambien sleeping pill. While in the ambulance, Malec appeared to understand where she was, showed no signs of intoxication or drug use, did not have mumbled or slurred speech, and did not appear confused.

¶ 15 A portion of Eng's body camera video showed his interaction with Malec in the ambulance. Malec told Eng that she suffers from anxiety. She takes Ambien, and its effects last four hours. She took an initial dose of Ambien at some point before the incident. She woke up later and decided to take another dose. She denied that her argument with defendant started because she wanted to take another dose; she explained that she had previously gotten out of bed because she was cold and went downstairs to adjust the thermostat. This had angered defendant. When she woke up later and decided to take another dose of Ambien, defendant was still angry that she had adjusted the thermostat. She told defendant that if he touched her again, she would fight back. Defendant then jumped across the bed and "grabbed [her] neck" (she demonstrated by placing her hand around her neck). She said that she then picked up the glass of Kool-Aid and "slammed it up against [defendant]" (she demonstrated by swinging her arm). When the glass hit him, it

shattered in her hand, cutting her thumb and his neck. She was not sure how defendant received the cuts on his hand.

¶ 16    Also on the video, Malec told Eng that defendant took her phone and purse when she told him that she needed to go to the hospital because of the cut on her hand. She then grabbed another phone, went into the bathroom, and called 911.

¶ 17    On cross-examination, Eng admitted that he was not a certified drug recognition expert and had no training on the effects or detection of eszopiclone.[1] He did not know that eszopiclone can cause "anxiety, depression, memory problems, unusual thoughts and behavior, thoughts of hurting oneself, confusion, [and] hallucinations[.]" He clarified that his opinion was that Malec showed no signs of "intoxication or drug usage." He acknowledged that, when Malec was recounting the incident to him in the kitchen, she gestured toward her neck and Eng "basically reiterated her gesture into a question which she agreed [with]." Eng also admitted that defendant told him that Malec suffers from anxiety and takes prescription sleeping medication. Defendant showed Eng the prescription bottle. Defendant also told Eng that he and Malec had had arguments over whether she needs the medication. In Eng's view, although Malec's ambulance account added details about events before the incident, that account was "mainly *** consistent" with her earlier account in the kitchen as to "where the crime took place, where [defendant] grabbed her by the neck and [*sic*] she struck him in defense basically."

---

[1]Malec claimed to have taken Ambien, but eszopiclone is not the generic name of Ambien, but of another sleep aid with the brand name Lunesta. *Eszopiclone*, https://www.drugs.com/eszopiclone.html [https://perma.cc/4ZZY-7V78] (last visited Mar. 18, 2025). Ambien's generic name is zolpidem. *Ambien*, https://www.drugs.com/ambien.html [https://perma.cc/4AS8-XYGD] (last visited Mar. 18, 2025).

¶ 18    On redirect examination, Eng testified that he believed Malec's hysteria on the night in question was attributable not to drug intoxication but to her "traumatic injury." Eng noted that Malec became quiet after defendant entered the kitchen but spoke more freely in the ambulance without defendant present. Eng reiterated that, although Malec's ambulance account was more detailed than her kitchen account, "what she claimed happened was consistent."

¶ 19    Malec testified for the State that she got out of bed at around 5 a.m. on January 28, 2024, to get some water to take an Ambien. When she reached over to grab her bottle of Ambien, defendant heard her. He did not want her to take the Ambien, but she took it anyway. Defendant, who was upset that Malec took the Ambien, went downstairs. She said some "choice words" to him. When he came back into the bedroom, she "threw a glass" toward him. At the time, she thought it hit him, but she was unsure. The glass broke and cut her thumb. When asked if defendant grabbed her before she threw the glass, Malec answered that sometimes defendant would grab and restrain her "when [she] [got] like that." She explained that she would have "attacks" and "really bad emotional moments." Asked again if defendant grabbed her before she threw the glass, she said she did not remember. When she returned from the hospital, she saw that her bedroom wall had dents and splattered Kool-Aid. According to her, the dents proved that the glass hit the wall, not defendant. Malec testified that the glass broke as she prepared to throw it.

¶ 20    After the incident, Malec started to get dressed to drive herself to the hospital. Because she had just taken an Ambien, defendant did not want her to drive. Malec became upset with defendant after he took her purse, so she grabbed her phone and ran into the bathroom. At the time, she thought that defendant was refusing to take her to the hospital, so she called 911 for an ambulance; she was "not thinking that he [was] trying to stop [her] from going to the hospital because [she] took a sleeping pill."

¶ 21    Malec testified that she recalled an ambulance arriving and her "being asked questions" by a police officer, but she "[did not] remember anything much after that." She "hardly [had] any memory of anything else because [she] was on sleeping pills, [she] was asleep and [she] learned things later of what happened." Malec recalled some of what she said to the 911 dispatcher and the police upon their arrival, but she claimed that her statements were about her ex-husband, not defendant; what she said was "not true for [defendant], true for [her] ex-husband." She acknowledged telling Eng in the kitchen that she tried to pick up a glass and hit defendant with it. She did not recall telling Eng that defendant grabbed her neck. She added, "I know that was something my ex-husband did to me. I received a bad injury from an incident with him." She reaffirmed that she had no memory of telling Eng that defendant grabbed her neck. She explained: "I was sleeping this entire time." Malec added that she suffers from hallucinations, "PTSD from [a] car accident," and anxiety. She suggested that Ambien makes her more prone to "disagreement[s]" with others.

¶ 22    Malec recalled being in an ambulance and Eng entering to speak with her. He commented about her neck. She initially testified that she did not recall anything else that was said in the ambulance. However, on further questioning, she said she recalled telling Eng that her argument with defendant was about her taking sleeping pills. But she did not recall Eng asking her why Kool-Aid was splattered on the wall. Nor did she remember telling Eng that she told defendant that she would fight back if he touched her again. Nor could she recall telling the 911 dispatcher or Eng that she was afraid to leave the bathroom. Malec testified that there had been a "misunderstanding": "I thought [defendant] was not going to allow me to leave, and again I recall the incident from my ex-husband [*sic*] he wouldn't allow me to leave after injuring me."

¶ 23    On cross-examination, Malec reiterated that she did not realize during the incident that it was in her best interests for defendant to prevent her from driving after she had taken Ambien. When defendant restrained her, he was trying to calm her down because she was "in a heightened emotional state sort of freaking out[.]" She denied that defendant has ever hit her or grabbed her aggressively. According to Malec, Eng asked her "leading" questions while she was under "duress" and the effects of Ambien. After she calmed down at the hospital, she could better reflect on the incident. Once she learned that the original police report did not mention her having taken Ambien, she filed an additional statement with the Lake County Sheriff's Office (additional statement).

¶ 24    On redirect examination, Malec testified that defendant restrained her by the arms to prevent her from driving. According to Malec, when she told the public defender that there was a "misunderstanding" and that she had taken Ambien on the night of the incident, the public defender told her to go to the sheriff's office to make a statement. She did so, giving the additional statement. When asked if she provided a written statement while in the ambulance, she responded that she did not recall being asked to do so.

¶ 25    The State played portions of recorded phone calls from defendant to Malec while he was in the jail following the incident. The first call was on January 28, 2024, at 9:20 a.m. Malec was crying during the call. Defendant told Malec, "You caused all this, you stabbed me, you did all kind of stuff." He also said she had "instigated all this." She had been "under duress" and "not in [her] right frame of mind." She "needed to tell the people that [she] [thought] this was blown out of proportion." She "let that man trick [her]."

¶ 26    The second call occurred around 6:41 p.m. on January 28, 2024. Defendant told Malec that they had a "serious situation" to deal with, that she needed to control her emotions, and that

"this man *** tricked [her]." Defendant also told her that she should use "legal terminology" and say that she was under "duress," suffered from anxiety, and that the police "led" her to make statements against defendant. He added that Malec, now that she had "calmed down" and had "clarity," should tell the authorities that she and defendant simply had an argument about waking each other up. Later during the call, defendant reiterated that Malec made a "statement under duress," had an "anxiety attack," and was not "clear[-]headed." The officer had "put[ ] words in [her] mouth." Further, "[she] thought [she] hit [him]. [She] did not. [She] only hurt [her]self." The scratches he received were from her fingernails when he tried to restrain her. They were not in a "domestic dispute."

¶ 27    After the phone calls were played, the State rested. Defendant moved for a directed finding, which was denied.

¶ 28    Eng was called to testify for defendant. Defendant played another portion of the video from Eng's body camera. The video showed the continuation of Eng's interchange with defendant in the kitchen. In the video, defendant told Eng that Malec had been hysterical and that he had simply tried to calm her down. When Eng asked defendant what medication Malec took, defendant walked into the kitchen and picked up a prescription bottle. Defendant explained to Eng that when Malec got up to take the medication, he took the bottle from her and told her she did not need it. Defendant added that Malec had "really bad anxiety" and would get "hysterical." On this occasion, he had to restrain her. Defendant then demonstrated by stretching out his arms and making a grabbing motion. Defendant denied hitting or choking Malec and claimed that he was just trying to calm her down.

¶ 29    Malec also testified for the defense. She identified a photograph she took of a glass like the one she broke during the incident. She also identified a photograph she took showing a dent

in the bedroom wall, to the left of the splattered Kool-Aid. She took this photograph after she returned from the hospital. Malec opined that the dent in the wall was from the glass striking it. According to Malec, she gave the additional statement because she did not mention everything to the deputies at the scene. The trial court denied defendant's request to admit the additional statement.

¶ 30 On cross-examination, Malec admitted that she took the photos of the glass and the bedroom wall after speaking to the defense attorney, but she denied that anyone suggested she take them. She also admitted that she gave the additional statement after the phone calls from defendant in jail. However, she claimed she had "already planned to tell [her] story."

¶ 31 The trial court found defendant guilty of both charges. In doing so, the court found that Malec was "certainly *** not a credible witness." The court emphasized the photos of Malec's neck showing red marks consistent with her statement to Eng that defendant grabbed her neck. The court also found that Malec, in giving her statement to Eng in the ambulance, communicated "clearly, lucidly, [and] consistently" and provided "very specific" details of the incident. The court described Malec in the ambulance as having "no hesitancy, *** no inconsistency, *** no blurring, *** no passing out and coming to, she was awake and *** clear."

¶ 32 The trial court disagreed with Malec that her photograph of the bedroom wall indicated that the glass hit the wall:

"it's not consistent with how she described it on the stand, that she threw it up against the wall and a dent somehow appeared to the left of the splattering across the entire wall which is just plausibly not likely at all to have occurred scientifically—I mean physically, it just would not occur. But it is consistent, the splattering in [the photograph] is consistent with

Miss Malec waving the glass in a defensive action as she moved her arm across and the liquid spattering across the wall in a wide impact across the wall."

¶ 33   The trial court also found that defendant's statements on Eng's body camera video were "full of inconsistencies."  In that regard, the court noted that defendant initially did not mention to Eng that Malec had taken Ambien but added that detail after he realized he was under suspicion of domestic battery.  The court further found that the cuts on the back of defendant's hand were consistent with defensive scratches from Malec's fingernails, not with picking up glass as defendant claimed.  Finally, the court found that the jail phone calls showed that defendant tried to pressure Malec to change her story to get him out of trouble.

¶ 34   Following the denial of defendant's posttrial motion, the trial court conducted a sentencing hearing.  In her victim impact statement, Malec affirmed defendant's innocence, denied the truth of her statements to Eng, and claimed she had been pressured by the State "to stick to a story that [she] [knew] was untrue."  Malec also commented that the entire process was unfair and that defendant, as a black man, was not presumed innocent.

¶ 35   The trial court merged count II (physical contact of an insulting or provoking nature) into count I (bodily harm) and sentenced defendant to 24 months' probation and 180 days in jail, with 120 days stayed.  Defendant, in turn, filed this timely appeal.

¶ 36                                    II. ANALYSIS

¶ 37   On appeal, defendant contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt of domestic battery.

¶ 38   When the sufficiency of trial evidence is at issue, we must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.  *People v. Cline*, 2022 IL 126383, ¶ 25.  All

reasonable inferences from the evidence must be made in the State's favor. *Cline*, 2022 IL 126383, ¶ 25. It is the responsibility of the trier of fact to weigh the evidence, resolve any conflicts, and draw reasonable inferences, and we do not substitute our judgment for that of the trier of fact or retry the defendant. *People v. Jackson*, 2020 IL 124112, ¶ 64. Having observed the witnesses, the trier of fact is much better positioned than the reviewing court to assess their testimony. See *Jackson*, 2020 IL 124112, ¶ 69. A single witness's positive and credible testimony is sufficient to sustain a conviction even if the defendant contradicts it. *People v. Harris*, 2018 IL 121932, ¶ 27. Contradictions do not necessarily destroy a witness's credibility, as it is the task of the trier of fact to determine when, if at all, a witness testified truthfully and to decide how flaws in aspects of the testimony affect the credibility of the whole. *People v. Gray*, 2017 IL 120958, ¶ 47. The trier of fact is not required to disregard inferences that flow normally from the evidence or to seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *Cline*, 2022 IL 126383, ¶ 41. A conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Cline*, 2022 IL 126383, ¶ 25.

¶ 39 A person who commits a battery of a family or household member is guilty of domestic battery. 720 ILCS 5/12-3.2(a)(1), (a)(2) (West 2022). A person commits battery when he knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual. 720 ILCS 5/12-3(a) (West 2022). Although the trial court found defendant guilty of both variants of battery, it entered a conviction on only the count charging battery by bodily harm.

¶ 40    Defendant does not dispute that Malec was a family or household member or that the marks on her neck constitute bodily harm. He disputes, rather, that he inflicted those marks. We hold that the State proved beyond a reasonable doubt that defendant battered Malec.

¶ 41    We begin by addressing the trial court's finding that Malec's trial testimony was not credible. As noted, the trial court was in a position superior to ours in assessing credibility. See *Jackson*, 2020 IL 124112, ¶¶ 66, 69. We have no basis to upset the court's credibility assessment of Malec. Her testimony for the State showed her reluctance to be a State's witness, because in her view the case rested on a "misunderstanding." (At sentencing, she continued to insist that defendant was innocent and had not received a fair trial. ) She repeatedly denied remembering most of her statement to Eng in the ambulance, particularly those aspects that tended to incriminate defendant. She explained that she was effectively sleeping when she gave the statement. However, we have reviewed the video of her statement in the ambulance and agree with the trial court that Malec appeared lucid and able to communicate, showed no signs of sleepiness, and provided a relatively detailed description of the incident. Although Malec was clearly upset throughout most of the ambulance conversation, she responded appropriately to Eng's questions and gave an intelligible account of the events.

¶ 42    Also unbelievable was Malec's testimony that, in describing the incident, she was actually referring to events that had occurred previously with her ex-husband. Lastly, defendant's phone calls from jail further showed that Malec was motivated to testify falsely. During those phone calls, defendant instructed her what to say in exact terms. Indeed, Malec's trial testimony employed the very "legal terminology" defendant dictated: she said she was under "duress" when Eng spoke with her and that he asked her "leading" questions. Thus, there was ample evidence to

justify the trial court's conclusion that Malec testified falsely because she did not want defendant convicted.

¶ 43    Setting aside Malec's implausible denials at trial, there was abundant evidence of defendant's guilt. When Eng spoke with Malec in the kitchen, she placed her hand around her neck to demonstrate what defendant did to her. When Eng, in response to her gesture, asked if defendant grabbed her neck, she appeared to nod in reply. Later, in the ambulance, Malec expanded on her account. She told Eng that defendant became angry when she got up from bed the first time. When she got up a second time, they argued. Defendant lunged across the bed and grabbed her neck. She then picked up a glass of Kool-Aid from the edge of the bed and hit defendant with it. In doing so, the glass broke and injured both her thumb and defendant's neck.

¶ 44    Malec's account to Eng in the ambulance was supported by physical evidence. The photos of her neck, taken at the scene, showed red marks consistent with a hand grabbing her neck. The red-liquid splatter on the bedroom wall bolstered her statement that she swung the glass of Kool-Aid and struck defendant with it. The severe cut on her hand corroborated her claim that the Kool-Aid glass broke when she swung it. Although Malec believed that the dent in her wall next to the Kool-Aid splatter indicated that she threw the glass and it hit the wall, we agree with the trial court that the Kool-Aid splatter was more consistent with her having swung the glass at defendant to defend herself.

¶ 45    Other evidence supported the guilty finding. As the trial court noted, defendant's video-recorded statements to Eng at the scene were inconsistent. For example, when Eng initially encountered defendant and spoke with him in the bedroom, he did not suggest that there was any conflict between him and Malec, much less that it involved Ambien. He said he was asleep when Malec rose from bed to go to the bathroom "or something." He claimed, vaguely, that she was

"being a little dramatic." Not until Eng mentioned that Malec had described a "domestic incident" did defendant acknowledge that there had been a conflict over Malec's taking Ambien. Also, when Eng asked defendant how he got the cuts on the back of his hand, defendant answered that the cuts were from picking up broken glass. As the court noted, it was implausible that defendant would injure the back of his hand by picking up broken glass.

¶ 46 Defendant's phone calls from jail further showed his guilt. In the first call, defendant told Malec that she caused the incident and instigated his arrest. He said that she had been under "duress" and not in the right frame of mind, that the police had tricked her, and that she should say that the situation was blown out of proportion. In the second call, defendant reiterated to Malec that the police had tricked her and "led" her—because of her "duress"—into giving an incriminating statement. He further instructed Malec to tell the authorities that he and Malec had merely argued about waking each other up. Defendant emphasized to Malec that they had not been in a domestic dispute. Clearly, defendant was attempting to intimidate or influence Malec to change her initial story and testify in his favor. This was evidence of consciousness of guilt. See *People v. Barrow*, 133 Ill. 2d 226, 261 (1989) (an attempt by a defendant to intimidate a witness is admissible to show consciousness of guilt); *People v. Johnson*, 2021 IL App (1st) 190567, ¶ 16 (same).

¶ 47 Viewing the totality of the evidence in the light most favorable to the prosecution, we conclude that the State proved beyond a reasonable doubt that defendant committed domestic battery. Thus, we affirm his conviction.

¶ 48                                 III. CONCLUSION

¶ 49 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 50 Affirmed.